IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

MIKE CAMPBELL,                    )
                                  )
                Plaintiff,        )
                                  )
        v.                        )        Case No. 2:18-cv-04129-BCW
                                  )
CHERI TOALSON REISCH,             )        ***ORAL ARGUMENT REQUESTED***
                                  )
                Defendant.        )


**Plaintiff's Suggestions in Opposition to Defendant's Motion to Dismiss
and Plaintiff's Motion to Strike Portions of Defendants' Motion to Dismiss**


Respectfully Submitted,

/s/ *J. Andrew Hirth*

J. Andrew Hirth, #57807
TGH Litigation LLC
913 E. Ash St.
Columbia, MO 65201
573-256-2850
andy@tghlitigation.com

*Counsel for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................. iii

STATEMENT OF FACTS ................................................................................................................ iv

INTRODUCTION ............................................................................................................................ 1

MOTION TO DISMISS STANDARD ............................................................................................ 1

ARGUMENT ..................................................................................................................................... 2

I.      This Court should adopt the careful reasoning of *Knight First Amendment Inst. at*
        *Columbia Univ. v. Trump* ...................................................................................................... 2

II.     Defendant's flawed critique of *Knight* provides no basis for this Court to reach
        a different conclusion from Judge Buchwald ....................................................................... 7

        A.      Plaintiff sufficiently pleads his speech has been restricted by Representative Reisch
                based on his viewpoint, and her attempts to controvert his well-pleaded
                allegations should be stricken from her motion as immaterial. ..................................... 7

        B.      Representative Reisch acted under color of state law when she barred Plaintiff
                from accessing or commenting on her tweets ................................................................. 8

        C.      Representative Reisch created a designated public forum by using her Twitter
                account to address her constituents and inviting their replies in the interactive
                space associated with her account ................................................................................ 11

        D.      Public policy favors open debate, not echo chambers ................................................. 14

CERTIFICATE OF SERVCE ......................................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**

*Arkansas Educ. Television Comm'n v. Forbes,*
 523 U.S. 666, 677 (1998) ...................................................................................5

Ashcroft v. Iqbal,
 556 U.S. 662, 677–78 (2009) ..............................................................................1

*Burton v. Wilmington Parking Auth.,*
 365 U.S. 715, 722 (1961) .................................................................................11

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
 473 U.S. 788, 801 (1985) .................................................................2, 3, 11, 12

*Corwin v. City of Indep., MO.,*
 829 F.3d 695, 699 (8th Cir. 2016) ......................................................................1

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez,*
 561 U.S. 661, 679 (2010) .................................................................................11

*Gen. Media Commc'ns, Inc. v. Cohen,*
 131 F.3d 273, 279 (2d Cir. 1997) .......................................................................5

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee,*
 505 U.S. 672, 678-79 (1992) ..............................................................................6

*Kittle-Aikeley v. Strong,*
 844 F.3d 727, 730 (8th Cir. 2016) ......................................................................8

Knight First Amendment Inst. at Columbia Univ. v. Trump,
 302 F. Supp. 3d 541 (S.D.N.Y. 2018)..........................................................*passim*

*Lehman v. City of Shaker Heights,*
 418 U.S. 298, 300–01 (1974).............................................................................3

*Lugar v. Edmondson Oil Co.,*
 457 U.S. 922, 939 (1982) .................................................................................11

*Luman v. Anderson,* No. 08-0514-CV-W-HFS,
 2010 WL 11565449, at *3 n.3 (W.D. Mo. Nov. 16, 2010) ...................................8

*Matal v. Tam,*
 137 S. Ct. 1744, 1763 (2017) .............................................................................7

*McAuley v. Fed. Ins. Co.,*
 500 F.3d 784, 787 (8th Cir. 2007) ......................................................................2

Case 2:18-cv-04129-BCW   Document 14   Filed 09/26/18   Page 3 of 22

*Morgan v. Bevin*,
298 F. Supp. 3d 1003 (E.D. Ky. 2018) ............................................................... 12, 13

*Perry Education Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37, 46–47 (1983) ..................................................................... 3, 4, 5, 12

*Paulsen v. County of Nassau*,
925 F.2d 65, 69 (2d Cir. 1991) ......................................................................... 5

*Pleasant Grove City, Utah v. Summum*,
555 U.S. 460, 480 (2009) ...................................................................... 4, 13, 14

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
515 U.S. 819, 830 (1995) ........................................................................ 3, 6, 12

*Signature Mgmt. Team, LLC v. Automattic, Inc.*,
941 F. Supp. 2d 1145, 1148 (N.D. Cal. 2013) ................................................. 8

*Southeastern Promotions, Ltd. v. Conrad*,
420 U.S. 546, 552 (1975) ........................................................................... 12

*United States v. Am. Library Ass'n*,
539 U.S. 194, 204 (2003) ............................................................................. 4

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
—— U.S. ——, 135 S.Ct. 2239, 2250 (2015) ........................................ 4, 13, 14

*West v. Atkins*,
487 U.S. 42, 49 (1988) .......................................................................... 9, 10

## Federal Rules

Fed. R. Civ. P. 12(b), (c), and (f) ...................................................................... 2, 8

Fed. R. Evid. 201 .............................................................................................. 8

## Other Sources

Lyrissa Lydsky, *Public Forum 2.0*, 91 BOSTON U. L. REV. 1975, 1996 (2011) .............................. 12, 13

## STATEMENT OF FACTS

Defendant Representative Cheri Toalson Reisch ("Representative Reisch") is a State Representative for the 44th District of the Missouri House of Representatives. Pet. ¶7. Like many other state representatives, she communicates with her constituents on the social media platform Twitter, which has more than 300 million active users worldwide, including some 70 million in the United States. *Id.* ¶¶23, 10. Twitter enables users to publish short messages to the general public called "tweets," to republish or respond to others' tweets, and to interact with other Twitter users. *Id.* ¶11. Tweets may include photographs, videos, and hyperlinks but cannot exceed 280 characters. *Id.* ¶12. Each Twitter user has a unique account name or "handle," which comprises an @ symbol followed by a word or phrase (e.g., @RealDonaldTrump), and a descriptive name (e.g., Donald J. Trump). *Id.* ¶13. Representative Reisch uses the Twitter handle @CheriMO44. *Id.* ¶24.

Twitter users may choose to "follow" other Twitter account holders by searching for their handles and clicking the "follow" button. *Id.* ¶14. A "followed" user's tweets automatically appear in the "following" user's Twitter feed—a continually updating scroll of new tweets from other users. *Id.* ¶15. A user may comment on the tweets of other users, or she may "retweet" their tweets to her own followers. *Id.* ¶16. Users may also see a log of their own past tweets, comments, and retweets, along with any comments or retweets they have received from their own followers. *Id.* ¶17. Some Twitter users publish hundreds of tweets per day while others merely read the tweets that appear in their Twitter feed. *Id.* ¶18. Twitter also enables its users to block particular users from following their tweets. *Id.* ¶19. If the blocked user attempts to follow the blocking user, he will see a message indicating that the other user has blocked her from following the account and viewing the tweets associated with the account. *Id.* ¶20.

Given its wide and instantaneous distribution, Twitter has become a common mode of communication between government officials and their constituents. *Id.* ¶21. For example, President

Trump frequently addresses the public through his personal Twitter account, @RealDonaldTrump. *Id.* ¶22. Similarly, Defendant uses her Twitter account to address her constituents, tout her accomplishments as a state representative, and promote her political agenda. *Id.* ¶26. On May 18, 2018, she retweeted a message from House Speaker Todd Richardson with the comment, "Thank you Mr. Speaker, you are a true gentleman. We worked hard and got the job done." *Id.* ¶27. Similarly, on May 23, 2018 she tweeted, "Great to have Governor @EricGreitens & Hallsville Mayor at the NRA Bianchi Cup today." *Id.* ¶28. On June 13, 2018 she tweeted, "Accomplished much in my 1st 2 years, ready for the next 2." *Id.* ¶29. The homepage for @CheriMO44 describes Representative Reisch as, among other things, "MO State Rep 44th District." *Id.* ¶25.

Plaintiff Mike Campbell ("Plaintiff") is a resident of Centralia, Missouri and registered to vote in Representative Reisch's district. *Id.* ¶6. Plaintiff is a frequent commentator on social media platforms such as Twitter, which he uses to follow and comment on posts by various state officials including Representative Reisch. *Id.* ¶¶1-3, 32. On June 22, 2018, Representative Reisch tweeted about her appearance at a Boone County Farm Bureau event and questioned the patriotism of her political opponent, Democrat Maren Jones, writing, "Sad my opponent put her hands behind her back during the Pledge." *Id.* ¶30. On June 23, 2018, Representative Kip Kendrick criticized Reisch's tweet by commenting, "Maren's father was a Lieutenant in the Army. Two of her brothers served in the military. I don't question [Maren's] patriotism. That's a low blow and unacceptable from a member of the Boone County delegation." *Id.* ¶31. Campbell agreed with Representative Kendrick and retweeted his criticism of Representative Reisch's tweet. *Id.* ¶32. Almost immediately after he did so, Representative Reisch blocked Campbell from following or commenting on her @CheriMO44 Twitter account. *Id.* ¶33. On information and belief, Representative Reisch has blocked dozens of other Twitter users from seeing or commenting on her tweets, including many of her own constituents in the 44th House District. *Id.* ¶35.

## INTRODUCTION

In a case similar to this one, the United States District Court for the Southern District of New York applied public forum analysis to President Trump's personal Twitter account, @RealDonaldTrump. *See Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541 (S.D.N.Y. 2018). Concluding that "the interactive space of a tweet from the @RealDonaldTrump account constitutes a designated public forum," *id.* at 575, the court held that "the blocking of the individual plaintiffs as a result of the political views they have expressed is impermissible under the First Amendment," *id.* at 575.

The same analysis applies to Representative Reisch's decision to block Plaintiff from the interactive space associate with her Twitter account due to his viewpoint. Like President Trump, Representative Reisch uses her personal Twitter account to communicate with her constituents and the general public about her government office and the actions she takes as a government official. Like President Trump, Representative Reisch invites her constituents to participate in the public discourse by responding directly to her tweets. Like President Trump, Representative Reisch has chosen to prohibit some constituents from participating in that public discourse because she does not like what they have to say. Like President Trump, Representative Reisch has violated the First Amendment. Her motion to dismiss should be denied.

## MOTION TO DISMISS STANDARD

On a motion to dismiss, courts "accept as true all facts pleaded by the non-moving party and grant all reasonable inferences from the pleadings in favor of the non-moving party." *Corwin v. City of Indep., MO.*, 829 F.3d 695, 699 (8th Cir. 2016). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff

1

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). "[M]atters outside the pleadings" include "any written or oral evidence in support of or in opposition to the pleading that provide some substantiation for and does not merely reiterate what is said in the pleadings." *McAuley v. Fed. Ins. Co.*, 500 F.3d 784, 787 (8th Cir. 2007) (internal citations omitted). If the court converts a motion to dismiss into a motion for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

## ARGUMENT

### I.    This Court should adopt the careful reasoning of *Knight First Amendment Inst. at Columbia Univ. v. Trump.*

The exact legal issue in this case—whether a public official may, consistent with the First Amendment, block a person from her Twitter account in response to the political views that person has expressed—was recently decided in the negative by the United States District Court for the Southern District of New York. *Knight*, 302 F. Supp. 3d at 549. That court concluded that the interactive space associated with the president's Twitter account constitutes a "designated public forum" in which the government may not restrict free expression based on viewpoint. Plaintiff provides a brief outline of Judge Buchwald's public forum analysis in *Knight* as a roadmap for deciding the same issues in this case.[1]

For a communication space to be susceptible to forum analysis, it must be owned *or controlled* by the government. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985). Such

---

[1] To avoid voluminous internal citations, Plaintiff frequently quotes or paraphrases Judge Buchwald's language throughout this section without pin cites or quotation marks, instead citing the underlying caselaw on which that court's decision was premised.

Case 2:18-cv-04129-BCW   Document 14   Filed 09/26/18   Page 8 of 22

a space may be "a forum more in a metaphysical than in a spatial or geographic sense," *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 830 (1995), and may "lack[ ] a physical situs," *Cornelius*, 473 U.S. at 801, in which case traditional conceptions of "ownership" may fit less well. It is important at the outset to determine the parameters of the putative forum by "focus[ing] on the access sought by the speaker." *Cornelius*, 473 U.S. at 801. For example, in *Cornelius*, where plaintiffs sought access to a fundraising drive conducted in the federal workplace, the fundraising drive specifically, rather than the federal workplace generally, constituted the would-be forum. *Id.* Similarly, in *Perry Education Ass'n v. Perry Local Educators' Ass'n*, where the plaintiff sought access to a public school's internal mail system in order to distribute literature, the mail system rather than the school was the space in question. 460 U.S. 37, 46–47 (1983). And in *Lehman v. City of Shaker Heights*, where the plaintiff sought access to advertising space on the side of city buses, the advertising space and not the buses constituted the putative forum. 418 U.S. 298, 300–01 (1974).

The putative forum at issue in *Knight* was the interactive space for replies and retweets associated with the president's Twitter account. The plaintiffs sought access to this space because their replies to the president's tweets would reach many, many more people that the individual plaintiffs could do on their own. 302 F. Supp. 3d at 566. Applying the precedent cited above, Judge Buchwald concluded that the interactive space associated with the president's Twitter account satisfied the government-control prong of the analysis:

> Though Twitter is a private (though publicly traded) company that is not government-owned, the President and [White House Social Media Director Daniel] Scavino nonetheless exercise control over various aspects of the @realDonaldTrump account: they control the content of the tweets that are sent from the account and they hold the ability to prevent, through blocking, other Twitter users, including the individual plaintiffs here, from accessing the @realDonaldTrump timeline (while logged into the blocked account) and from participating in the interactive space associated with the tweets sent by the @realDonaldTrump account. Though Twitter also maintains control over the @realDonaldTrump account (and all other Twitter accounts), we nonetheless conclude that the extent to

3

> which the President and Scavino can, and do, exercise control over
> aspects of the @realDonaldTrump account are sufficient to establish
> the government-control element as to the content of the tweets sent
> by the @realDonaldTrump account, the timeline compiling those
> tweets, and the interactive space associated with each of those tweets.
> While their control does not extend to the content of a retweet or
> reply when made … it nonetheless extends to controlling who has
> the power to retweet or reply in the first instance.

*Knight*, 302 F. Supp. 3d at 566–67.

Application of public forum analysis must also be consistent with the purpose, structure, and intended use of the space because the same property may constitute a public forum for some purposes and not for others. *Id.* at 565. For instance, a public park is susceptible to forum analysis when "used for purposes of assembly, communicating thoughts between citizens, and discussing public questions," *Perry*, 460 U.S. at 45, but the same public park is not when "the installation of permanent monuments" is concerned, *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 480 (2009). Generally, "[t]he forum doctrine has been applied in situations in which government-owned property or a government program was capable of accommodating a large number of public speakers without defeating the essential function of the land or the program. *Id.* at 478. By contrast, forum analysis is not appropriately applied when "the government has broad discretion to make content-based judgments in deciding what private speech to make available to the public." *United States v. Am. Library Ass'n*, 539 U.S. 194, 204 (2003) (plurality opinion). And when the government "is speaking on its own behalf, the First Amendment strictures that attend the various types of government-established forums do not apply" at all. *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, ––– U.S. ––––, 135 S.Ct. 2239, 2250 (2015) (holding government issued license plates are not public forums for private speech).

Judge Buchwald concluded that the purpose, structure, and intended use of the interactive space associated with the president's Twitter account were consistent with the Supreme Court's public forum jurisprudence. While the president's own tweets are government speech, the interactive

4

space for replies and retweets created by the president's tweets can accommodate an unlimited number of replies and retweets, which are controlled exclusively by the Twitter users who write them. *Knight*, 302 F. Supp. 3d at 573. Thus, the interactive space associated with each of the President's tweets is properly analyzed under the Supreme Court's forum precedents:

> the interactive space of each tweet, as distinguished from the content of the tweet, [is not] constrained by the notions of inherent selectivity and scarcity that the Supreme Court held to counsel against the application of forum doctrine in … *Pleasant Grove City*…. Rather, the interactive space is capable of accommodating a large number of public speakers without defeating [its] essential function; and indeed, the essential function of a given tweet's interactive space is to allow private speakers to engage with the content of the tweet, which supports the application of forum analysis.

*Knight*, 302 F. Supp. 3d at 572–73 (internal citations omitted).

The Supreme Court has recognized at least three classes of forums for First Amendment purposes. *Id.* "Traditional public forums" are "places which by long tradition or by government fiat have been devoted to assembly and debate." *Perry*, 460 U.S. at 45. "Designated public forums" are spaces "the state has opened for use by the public as a place for expressive activity." *Id.* at 45. Finally, a space that is susceptible to forum analysis but is "not by tradition or designation a forum for public communication," *id.* at 46, is termed a "nonpublic forum," *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998). "Governmental intent" is "the touchstone for determining whether a [designated] public forum has been created." *Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273, 279 (2d Cir. 1997). "Intent is not merely a matter of stated purpose. Indeed, it must be inferred from a number of objective factors, including: the government's policy and past practice, as well as the nature of the property and its compatibility with expressive activity." *Paulsen v. County of Nassau*, 925 F.2d 65, 69 (2d Cir. 1991) (internal citations omitted).

Taking these factors together, Judge Buchwald concluded that the interactive space of a tweet from the president's account constitutes a designated public forum because it is generally

5

accessible to the public at large without regard to political affiliation or any other limiting criteria, any member of the public can view his tweets, and anyone with a Twitter account may participate in the interactive space by replying or retweeting—anyone, that is, who hasn't been blocked from doing so by the president. *Knight*, 302 F. Supp. at 574. The interactivity of Twitter is one of its defining characteristics, and the interactive space of the President's tweets accommodates a substantial body of expressive activity. *Id.* at 575.

"Regulation of [a designated public forum] is subject to the same limitations as that governing a traditional public forum"—restriction are permissible "only if they are narrowly drawn to achieve a compelling state interest." *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678-79 (1992). Regardless of the specific nature of the forum, however, "[v]iewpoint discrimination ... is presumed impermissible when directed against speech otherwise within the forum's limitations." *Rosenberger*, 515 U.S. at 830. "When government creates such a forum, in either a literal or 'metaphysical' sense, some content- and speaker-based restrictions may be allowed." *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) (internal citations omitted). "However, even in such cases … viewpoint discrimination is forbidden." *Id.* President Trump did not dispute that he blocked the *Knight* plaintiffs because their replies to his tweets were critical of his administration, and exclusion based on viewpoint is impermissible under the First Amendment. 302 F. Supp. 3d at 575.

As Representative Reisch acknowledges, "Plaintiff has crafted his Complaint to fit the Southern District's holding in *Knight.*" Def. Sugg. at 3. Defendant uses her Twitter account to address her constituents about her accomplishments as a state representative and to discuss matters important to her political agenda. Her Twitter account is generally accessible to the public at large without regard to political affiliation or any other limiting criteria, any member of the public can view her tweets, and anyone with a Twitter account may participate in the interactive space by replying to Defendant's tweets or retweeting the replies of others. Adopting the reasoning in *Knight,*

6

this Court should conclude that the interactive space associated with Representative Reich's Twitter account is a designated public forum.

## II. Defendant's flawed critique of *Knight* provides no basis for this Court to reach a different conclusion from Judge Buchwald.

Representative Reisch makes no attempt to distinguish her conduct from the president's or to deny that she blocked Plaintiff from her Twitter account based on his viewpoint. Instead, she argues that *Knight* was wrongly decided as a matter of law and urges this Court to reach a different legal conclusion. To that end, Defendant advances four main arguments. Alleging facts outside the pleadings, she first attempts to controvert Plaintiff's primary factual allegation—that he was actually blocked from accessing or commenting on her Twitter account. Next, she disputes that she acted under color of law when blocking Plaintiff from her Twitter account. Third, she argues that the interactive space associated with her Twitter account is not a designated public forum because she does not "own" her Twitter account. Fourth, she suggests that Plaintiff is actually the one seeking to restrict free speech. All four arguments fail as a matter of law.

### A. Plaintiff sufficiently pleads his speech has been restricted by Representative Reisch based on his viewpoint, and her attempts to controvert his well-pleaded allegations should be stricken from her motion as immaterial.

Plaintiff alleges, "Representative Reisch blocked [him] from following or commenting on her @CheriMO44 Twitter account." *Id.* ¶33. He also attached as Exhibit H to his Petition a screen shot of the notice he received that Defendant had blocked him. [Docket No. 1-8]. Nonetheless, Defendant *disputes* Plaintiff's factual allegations by citing matters wholly outside the pleadings. Def. Sugg. at 8. Pointing to illegible screen shots of a tweet by some other, unidentified person named "Becky," Defendant claims "a blocked user is only prevented from directly replying to the blocking user. She still, however, may reply to others' replies to the blocking user's original tweet." *Id.* at 8-9.

Defendant's argument has no place in a motion to dismiss, as to which a court must accept all well-pleaded factual assertions as true. Although Defendant asserts that "Twitter postings and

7

information on Twitter's homepage … are matters of which the Court may take judicial notice and consider on a motion to dismiss," Def. Sugg. at 7-8, none of the cases she cites in her Suggestions supports that proposition.[2] Under the Federal Rules of Evidence, "The court may judicially notice a fact *that is not subject to reasonable dispute* because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b) (emphasis added). Defendant's factual assertion that she has not actually blocked Plaintiff from her Twitter account or that blocking him doesn't restrict his speech—both of which contradict facts expressly alleged in the Complaint—is not a "fact that is not subject to reasonable dispute." Accordingly, Plaintiff moves to strike footnotes 1-3, the images and factual assertions on pages 8-9 of Defendant's Suggestions, and all purported quotes from Twitter's "Terms of Service" on page 13 as immaterial. *See* Rule 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter").

Plaintiff has plausibly alleged that Defendant has restricted his speech in the interactive space associated with her Twitter account based on his viewpoint. Representative Reisch may contradict Plaintiff's evidence at trial, but she may not dispute his allegations in a motion to dismiss.

## B. Representative Reisch acted under color of state law when she barred Plaintiff from accessing or commenting on her tweets.

Defendant claims that barring Plaintiff from the interactive space of her Twitter account cannot be considered "state action" because (1) she "does not operate her account on behalf of the state"; and (2) "blocking a Twitter account is not an exercise of state power." Def. Sugg. at 9-10.

---

[2] In *Kittle-Aikeley v. Strong*, for example, the court took judicial notice of *government documents*—a surgeon general's report, congressional findings, and statistical information from the US Sentencing Commission—which happened to be published on NBC News's website. 844 F.3d 727, 730 (8th Cir. 2016). In a footnote in *Luman v. Anderson*, Judge Sachs took judicial notice of internet postings *that plaintiffs cited to corroborate the allegations in their complaint*, but he did not find them persuasive or rely on them in denying defendants' motion to dismiss. No. 08-0514-CV-W-HFS, 2010 WL 11565449, at *3 n.3 (W.D. Mo. Nov. 16, 2010). And in *Signature Mgmt. Team, LLC v. Automattic, Inc.*, the court took judicial notice of the "existence" of blog posts but expressly declined to take judicial notice "of any facts recited therein." 941 F. Supp. 2d 1145, 1148 (N.D. Cal. 2013).

Defendant is correct that "individuals who hold public office routinely engage in personal conduct that are [sic] not exercises of state power." *Id.* But the fact that a state official's conduct does not *always* qualify as state action does not mean that it *never* does. The relevant inquiry is, what is the purpose of her conduct *in this case*. Regardless of what else she may tweet about from time to time, Representative Reisch uses her Twitter account "to address her constituents, tout her accomplishments as a state representative, and promote her political agenda." Compl. ¶26. Using the Twitter account "CheriMO44"—which explicitly identifies her as "MO State Rep 44th District"— Defendant tweets about her work as a member of the Missouri House of Representatives. She has thanked the Speaker of the House for his leadership, noting that she and her fellow state representatives "worked hard and got the job done" during the most recent legislative session. *See* Compl. Ex. B. She has reported to her constitutions that she "[a]ccomplished much in my 1st 2 years" as their state rep and is "ready for the next 2." *See* Compl. Ex. D. And, she has used her Twitter account to impugn the patriotism of the woman running to replace her as state representative for the 44th House District, tweeting "Sad my opponent put her hands behind her back during the Pledge" at a Farm Bureau meeting. Compl. Ex. E. In each case, Defendant is discussing her actions *as a state official* and inviting her constituents to engage in a public dialogue about her actions as their state representative. Indeed, communicating with constituents and inviting their input is *the quintessential job of a state representative in our republican system of governmen*t.

Defendant also claims the act of blocking someone from her Twitter account is not state action because the power to do so was given to her by Twitter, not the government, and it is a power possessed by everyone with a Twitter account. To act under color of state law, she argues, a government official must "exercise[] power possessed by virtue of state law and made possible only because [she] is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988).

9

Defendant reasons that "use of a feature of Twitter's software simply cannot supply the state action required to sustain a § 1983 claim." *Id.*

Defendant misses the point. The relevant power she "possesse[s] by virtue of state law and made possible only because she is clothed with the authority of state law" is the *creation of designated public forum*. When a private citizen speaks his mind on a matter of public policy, his words are precatory. Perhaps they will reach the ear of someone in the halls of power, where they may be considered or ignored based on their persuasive force. That does not change merely because he uses social media rather than writing an Op-Ed. But when a government official—particularly a member of a legislative body—tweets her thoughts on a matter of public policy, she is disseminating a legislative agenda to the public at large. And when she does so on an *interactive* social media platform like Twitter, with its infinite space for followers to respond, she is inviting input from the public in return. If she subsequently removes certain speakers from that forum based on their viewpoint, it does not matter whether they are removed by computer software or armed police. Either way, they are being excluded from the public discourse about their government's policies and actions. As Judge Buchwald explained in *Knight*, Defendant's "software" argument,

> which focuses on the act of exclusion divorced from the context of the space from which a person is being excluded, proves too much …. Defendants correctly argue that blocking is a capability held by every Twitter user, but the power to exclude is also one afforded generally to every property owner. … The right to exclude is perhaps the most fundamental of all property interests, and it is one shared by the government and private property owners alike. The context of the property from which the government is excluding, therefore, must factor into the analysis. No one can seriously contend that a public official's blocking of a constituent from her purely personal Twitter account—one that she does not impress with the trappings of her office and does not use to exercise the authority of her position—would implicate forum analysis, but those are hardly the facts of this case.

10

*Knight*, 302 F. Supp. 3d at 568-69 (internal citations omitted). When Representative Reisch began

using her Twitter account to address and seek comment from her constituents on matters of public

concern, she created a designated public forum—which is always done under color of state law.

Whether Representative Reisch's use of Twitter to block her constituent from commenting

on her message is a "necessarily fact-bound inquiry." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939

(1982); *see also Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961)("Only by sifting facts and

weighing circumstances can the nonobvious involvement of the State in private conduct be

attributed its true significance"). At this stage of the litigation, Plaintiff has sufficiently *alleged* that

Representative Reisch uses her Twitter account for official purposes by addressing her constituents

about her legislative accomplishments and political agenda.

C.    **Representative Reisch created a designated public forum by using her Twitter account to address her constituents and inviting their replies in the interactive space associated with her account.**

In her third argument for dismissal, Defendant claims that the interactive space associated

with her Twitter account cannot be a designated forum because the account itself is owned by

Twitter, Inc.—a private company—rather than by her or the state of Missouri. Def. Sugg. at 13.

Defendant essentially contends the government must hold the legal title to a space before it can be

considered a public forum. As Judge Buchwald observed in *Knight,* however, the Supreme Court has

"made clear that a space may be a forum based on *government control* even absent legal ownership."

302 F. Supp. 3d at 566 (emphasis added) (citing *Christian Legal Soc'y Chapter of the Univ. of Cal. v.

Martinez*, 561 U.S. 661, 679 (2010) ("[T]his Court has employed forum analysis to determine when a

governmental entity, in regulating *property in its charge*, may place limitations on speech.")(emphasis

added); *Cornelius*, 473 U.S. at 801 ("[A] speaker must seek access to public property *or to private

property dedicated to public use* to evoke First Amendment concerns.")(emphasis added); *Perry*, 460 U.S.

11

at 46 ("the First Amendment does not guarantee access to property simply because it is owned *or controlled* by the government.")(emphasis added)).

In *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 552 (1975), for example, the City of Chattanooga leased a privately-owned local theater to provide a public space for the performing arts. When a traveling production company asked to perform the musical *Hair* at the theater, the "Auditorium Board" appointed by the City Council to select theater programming turned the company down. Although the theater was privately owned, the Supreme Court held the decision of the City's Auditorium Board was "indistinguishable in its censoring effect from the official actions consistently identified as prior restraints in a long line of this Court's decisions." *Conrad*, 420 U.S. at 546. Requiring governmental control, rather than complete ownership, is not only consistent with forum analysis's focus on "the extent to which the Government can control access" to the space and whether that control comports with the First Amendment, *Cornelius*, 473 U.S. at 800, but also better reflects that a space can be "a forum more in a metaphysical than in a spatial or geographic sense," *Rosenberger*, 515 U.S. at 830; *see also* Lyrissa Lydsky, *Public Forum 2.0*, 91 BOSTON U. L. REV. 1975, 1996 (2011)("Just as the government can rent a building to use as a forum for public debate and discussion, so, too, can it 'rent' a social media page for the promotion of public discussion.").

Instead of the thoroughly reasoned opinion in *Knight,* Defendant urges this Court to adopt the contrary reasoning of Judge Van Tatenhove in *Morgan v. Bevin*, 298 F. Supp. 3d 1003 (E.D. Ky. 2018). But Defendant's reliance on *Morgan* is misplaced for a host of reasons. First, that case was decided on a preliminary injunction motion rather than a motion to dismiss. That plaintiff had to show a likelihood of success on the merits based on evidence adduced by both sides at the preliminary injunction hearing. Here, Plaintiff need only show his allegations, if true, state a claim upon which relief can be granted.

12

Secondly, U.S. District Court for the Eastern District of Kentucky "ignored the necessary and important role governments play in 'configuring' communications spaces in ways that either foster or thwart public discourse." Lydsky, *supra*, at 2014. Reducing the issue presented to a mere tautology, Judge Van Tatenhove neatly concluded that "Governor Bevin is under no obligation to listen to Plaintiffs, and Plaintiffs have no Constitutional right to be heard in this precise manner." *Morgan*, 298 F. Supp. 3d at 1011. But the issue in these cases is not whether the plaintiff had a right *to be heard*, but rather whether he had a right *to speak*. If Governor Bevin issues a press release or puts up a billboard promoting his political agenda, the plaintiff has no right to tack his own message onto the press release or spray-paint his response on the billboard. But the governor's Twitter account is neither a press release nor a billboard. It is an *interactive* forum designed for the governor's followers to reply to his messages. By using Twitter rather than a non-interactive medium, and by creating an interactive space for comments with each tweet, the governor created a designated public forum in which his constituents may communicate with one another. *See* Lydsky, *supra*, at 2008 ("the effect of public forum doctrine is to create a right of speakers' access, both to places and to people") (internal citations omitted). The governor doesn't have to read his constituent's responses, but nor can he choose which individuals get to respond based on their viewpoint.

Like the court in *Morgan*, Defendant relies too heavily on the flawed analogy between her Twitter page and both the public park in *Pleasant Grove*, 555 U.S. 460 (2009) and the license plates in *Walker*, 135 S. Ct. 2239. In *Pleasant Grove*, the Church of Summum wanted to donate a monument engraved with the Seven Aphorisms of Summum to be placed in a public park near another monument of the Ten Commandments. In *Walker*, a group committed to preserving Confederate history wanted the state to issue specialty license plates with the Confederate battle flag. In both cases, the Supreme Court held that the government did not have to accept speech with which it did not agree *as its own message*. Once erected on public property, the Summum monument would be

13

seen as the City's own speech. Likewise, a state-issued license plate with the Confederate flag would be seen as the state's own message.

The present case is not analogous to *Pleasant Grove* or *Walker* because Plaintiff is not asking Representative Reisch to use her own Twitter account to disseminate his message. All he wants is the right to respond to her tweets like everyone else. Defendant was not under any obligation to use Twitter to communicate with her constituents, but she chose to do so. Electing to communicate her message over Twitter rather than a press release or a billboard, Defendant created a space for her colleagues, constituents, and fellow citizens to respond to her tweets and engage in an open dialogue. Having created a designated public forum, Defendant cannot prohibit participation within that forum based on the viewpoint of the speaker.

### D.    Public policy favors open debate, not echo chambers.

Defendant's final argument for dismissal is that a ruling in Plaintiff's favor would likely force her to close down her Twitter account, thereby reducing rather than expanding speech rights. She cites the Supreme Court's warning in *Pleasant Grove,* 555 U.S. at 479-80, that "[i]t would be inappropriate to deem the park a public forum—and thereby impose the attendant requirement of viewpoint neutrality—only to cause the closure of that very forum." Def. Sugg. at 14. But as noted above, monuments in public parks are a poor analogy for replies and retweets in the interactive space associated with Defendant's Twitter account. Monuments in a park are government speech, whereas replies and retweets in the interactive space of Representative Reisch's Twitter account are clearly identified as the words of the person replying and are not likely to be seen as the Representative's own speech. *See Knight*, 302 F. Supp. 3d at 572. Moreover, Parks have a limited amount of space available for monuments, whereas Twitter has nearly infinite space for replies and retweets. *Id.* at 573 ("the interactive space is capable of accommodating a large number of public speakers without defeating its essential function").

Defendant argues that applying public forum analysis to Twitter "virtually eliminates her ability to control the content of messages appearing on her account" and "expose[s] her[] and her audience to unwanted content … [which] might include truly-repugnant (yet clearly First Amendment protected) content." *Id.* She suggests she "might reasonably conclude that she would prefer no Twitter account at all to one on which she and her audience are constitutionally compelled to tolerate profane, racist, or obnoxious content." This parade of horribles is overblown. No one is arguing that Defendant's *entire* Twitter account is a public forum, only the interactive space for replies below each tweet. Representative Reisch will always retain complete control over her own tweets and is free to ignore any replies. Moreover, her concern about "truly repugnant content" is a straw man: there is no allegation that Plaintiff's retweet *in this case* was in any way vulgar, racist, or otherwise outside the bounds of reasonable discourse. The First Amendment does not allow government officials to censor all criticism simply because someone else might use bad words in the future.

Twitter is the medium of choice for politicians afraid of engaging in public debate. President Trump, former Missouri Governor Eric Greitens, and many other government officials nationwide are choosing to address the public almost exclusively through social media, where they can snipe at their political opponents from a distance and don't have to answer difficult questions from intrepid reporters. Their messages reach those who share their political views, who then retweet the same messages hundreds or thousands of times to their own followers, spreading the official's message even further. Twitter is a public address system unlike any the world has ever known. Like President Trump, Representative Reisch believes she is entitled to exclusive control over that system by permitting retweets and comments only from those who agree with her. That level of control over public debate runs contrary to the Supreme Court's public forum doctrine and the principles enshrined in the First Amendment. Defendants' motion to dismiss should therefore be denied.

15

CERTIFICATE OF SERVICE

I certify that I filed the foregoing Suggestions through the Court's ECF system on

September 26, 2018, which will cause a copy of the same to be served electronically on all counsel of

record.

/s/ *J. Andrew Hirth*

*Counsel for Plaintiff*