IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

MIKE CAMPBELL,                    )
                                  )
              Plaintiff,          )   No. 18-04129-CV-C-BCW
                                  )   April 19, 2019
     V.                           )   Kansas City, Missouri
                                  )   CIVIL
REPRESENTATIVE CHERI              )
TOALSON REISCH,                   )
                                  )
              Defendant.          )

TRANSCRIPT OF BENCH TRIAL

BEFORE THE HONORABLE BRIAN C. WIMES
UNITED STATES DISTRICT JUDGE

Proceedings recorded by electronic stenography
Transcript produced by computer

**APPEARANCES**

For Plaintiff:          MR. J. ANDREW HIRTH
                        TGH Litigation LLC
                        28 N. 8th Street, Suite 500
                        Columbia, MO 65201

For Defendant:          MR. LOWELL D. PEARSON
                        Husch Blackwell LLP
                        P. O. Box 1251
                        235 E. High St.
                        Jefferson City, MO 65102

Kathleen M. Wirt, RDR, CRR
United States Court Reporter
400 E. 9th Street, Suite 7452 * Kansas City, MO 64106
816-512-5608

1                        I N D E X

2

PLAINTIFF'S WITNESSES:

3

    MIKE CAMPBELL
4        Direct Examination by Mr. Hirth              12
         Cross-examination by Mr. Pearson             33

5

    CHERI TOALSON REISCH
6        Direct Examination by Mr. Hirth              40
         Cross-examination by Mr. Pearson             64

7                            - - -

8                        E X H I B I T S

9
PLAINTIFF'S EXHIBITS                    OFFERED   RECEIVED
10
1 - Reisch Twitter feed                4         5
11
2 - 6/22/2018 tweet with comments      4         5
12
5 - list of blocked Twitter users      4         5
13
6 - 5/8/2018 tweet                     4         5
14
7 - 5/23/2018 tweet                    4         5
15
8 - 6/13/2018 tweet                    4         5
16
9 - 6/23/2018 tweet                    4         5
17
10 - Campbell retweet of 6/23/2018 tweet  4      5
18
11 - notification of being blocked     4         5
19
12 - press release                     4         5
20
13 - Campbell Twitter feed             4         5
21
14 - 3/15/2019 tweet                   4         5
22
15 - 3/28 and 3/29 series of tweets
23
16 - letter to the editor              7         8
24

25                        *  *  *  *
                            *  *  *  *

1                      APRIL 19, 2019

2                         - - -

3           THE COURT:  Okay.  Good morning.  Let the Court call

4    the case.  This is Mike Campbell versus Cheri -- is it Reisch?

5           THE DEFENDANT:  Cheri Toalson Reisch.

6           THE COURT:  Reisch, okay.  Cheri Toalson Reisch,

7    Case No. 18-CV-04129.  Could I have the parties enter their

8    appearance for the record, please?

9           MR. HIRTH:  Yes, Your Honor.  Andy Hirth on behalf

10   of Mike Campbell, and I also have my law clerk, Aaron

11   Wynhausen, with me.

12          THE COURT:  Okay, good morning.  Good morning, all.

13          MR. PEARSON:  Lowell Pearson, Your Honor, for

14   Defendant Cheri Toalson Reisch, and Representative Reisch is at

15   counsel table with me.  Thank you, sir.

16          THE COURT:  Thank you.  Well, a couple things, just

17   preliminary matters that we'll take up.  I'm not sure if

18   counsel wanted to invoke the rule, or is that necessary,

19   really?

20          MR. HIRTH:  I don't think it's necessary.

21          MR. PEARSON:  No, not from our perspective, Your

22   Honor.

23          THE COURT:  Okay, great.  Secondly, was it your

24   intent to -- you know, we've had this case in front of me, I

25   had a hearing on this case.  Do you want to do a brief opening,

1  or -- again, I'm affording you that opportunity, not that I

2  necessarily need that either, but...

3          MR. HIRTH:  I intend to do an extremely brief

4  opening.

5          THE COURT:  Okay.  Okay, we can just proceed in that

6  manner, and I'll have you -- if you would like to do your

7  opening, and then we'll start with our evidence.

8          Anything else we need to take up pretrial-wise?

9          MR. HIRTH:  We had a couple of preliminary

10  housekeeping matters --

11          THE COURT:  Sure.

12          MR. HIRTH:  -- if we could address those first, Your

13  Honor.

14          We have given you a copy of all of the exhibits in a

15  binder up there.  Exhibits 3 and 4 have been removed, we're not

16  using those, but all of the others we have stipulated as to the

17  authenticity of them, and I don't think there's any objection

18  by either party to their admission.

19          THE COURT:  Okay.

20          MR. HIRTH:  So we just wanted to sort of get that

21  up and -- Lowell, did you have anything else you wanted to add

22  to that?

23          MR. PEARSON:  No.  I think it might be helpful,

24  Andy, to the judge to maybe just explain each of the exhibits

25  briefly since we don't plan to put them into evidence through

1  witness testimony.  If that would be helpful, Your Honor, I

2  think Mr. Hirth could do that.

3         THE COURT:  Right.  Why don't we do this now, just

4  for the record make sure.  So Plaintiff's Exhibits, or

5  exhibits -- Plaintiff's Exhibits 1 through 14 shall be admitted

6  at this time.

7         MR. HIRTH:  And, Your Honor, we have an additional

8  exhibit --

9         MR. PEARSON:  Your Honor, with the exception of 3

10 and 4.

11        THE COURT:  With the exception of 3 and 4.

12        (Plaintiff's Exhibits 1-2 and 5-14 were admitted

13 into evidence.)

14        MR. PEARSON:  Yes.  Thank you, sir.

15        THE COURT:  And then I assume they're not in here,

16 correct?

17        MR. HIRTH:  They're not in there.

18        THE COURT:  Okay.

19        MR. HIRTH:  And then there's actually two additional

20 exhibits that have come into existence since we filed our

21 exhibit lists.  I don't believe that there is any objection to

22 those coming into evidence either.  Those will be

23 objections 15 -- or Plaintiff's Exhibit 15 and 16.  15 should

24 be included in your book already.

25        THE COURT:  15 should be?

1    MR. HIRTH:  15 should be included.  And if the Court

2 would like, I'm happy to walk through those and tell the Court

3 what each exhibit is.

4    THE COURT:  Bear with me one second.

5    MR. HIRTH:  Sure.

6    THE COURT:  Okay, counsel.  If you would like to

7 now, you can kind of briefly go through what these exhibits

8 are.

9    MR. HIRTH:  Sure.  So Exhibit 1 is a 105-page

10 document.  It is a printout of Ms. Reisch's Twitter feed.  It

11 does not have all of the comments and all of the replies that

12 go with Twitter, as those things are sort of exponentially

13 expandable, but it is the set of tweets that we agreed upon to

14 include in the record.

15    THE COURT:  Okay.

16    MR. HIRTH:  Exhibit 2 is a subsection of that big

17 document that is just limited to one tweet and the actual

18 comments that go with it.

19    Document No. 5 is a list of users who have been

20 blocked from the representative's Twitter account.

21    Exhibits 6, 7, and 8 are also three individual

22 tweets that we have singled out from the larger document.

23    Exhibit 9 is the tweet that is at issue in this

24 case, essentially, the tweet from Representative -- the

25 response from Representative Kendrick to Representative

1  Reisch's tweet, and then the comments thereto.

2          Exhibit 10 is Mr. Campbell's retweet of that

3  comment.

4          Exhibit 11 is the notification Mr. Campbell received

5  that he had been blocked.

6          Exhibit 12 is a press release issued by the

7  defendant after this lawsuit was filed.

8          Thirteen is, like Exhibit 1, a printout of Mr.

9  Campbell's Twitter feed.  Again, it's not everything in the

10  history of his Twitter feed, but it is the things that we have

11  agreed upon to include.

12          Exhibit 14 is an additional -- or a series of tweets

13  from March 15th.

14          Exhibit 15 is another series of tweets from March

15  28th and 29th.

16          And then Exhibit 16, if we get to it, is a letter to

17  the editor by the defendant from this past Wednesday.

18          THE COURT:  Okay.  And when you say if we get to it,

19  what does that mean?  Because I'm assuming they would be

20  admitted into evidence if you --

21          MR. HIRTH:  Yeah, I'm happy to give you a copy of it

22  now, we can do that.  They're actual newspapers, so that might

23  be the easiest thing anyway.

24          THE COURT:  Okay.

25          MR. HIRTH:  If I may approach, Your Honor, and give

1   you a copy.

2           THE COURT:  Yes, you may.  Thank you.

3           MR. HIRTH:  I think that's all the housekeeping

4   matters we have.

5           MR. PEARSON:  Your Honor, the defendant has no

6   objection to the admission of Exhibit 16.

7           THE COURT:  Okay.  Exhibit 16 shall be admitted.

8           (Plaintiff's Exhibit 16 was admitted into evidence.)

9           MR. HIRTH:  And I think we're ready to proceed, Your

10  Honor.

11          THE COURT:  Give me a few minutes to get things

12  ready up here and then I'll...

13          Okay.  Counsel, you can proceed.

14          MR. HIRTH:  Thank you.  May it please the Court.

15          THE COURT:  You may.

16          MR. HIRTH:  There's a bedrock principle of First

17  Amendment law that government officials may not limit the

18  speech in a public forum -- limit speech in a public forum

19  based upon the viewpoint of the speaker.  In this case,

20  Plaintiff Mike Campbell alleges that his state representative,

21  Cheri Toalson Reisch, did exactly that by blocking him from her

22  Twitter account because she did not like the message that he

23  posted.

24          Most of the facts underlying Mr. Campbell's claim

25  are not disputed.  To streamline the trial, the parties have

1    submitted a stipulation of facts that we all agree on.  That is

2    Docket No. 43, and we've also included a copy of it in your

3    binder.  We've also designated portions of Representative

4    Reisch's deposition, which are also included in there, to which

5    there are no objections.  And we -- that is also Docket No. 45,

6    and we intend to call only two live witnesses today.

7          Taken together, the stipulated facts, deposition

8    designations, and live testimony that we will present today

9    will show that Representative Reisch created a designated

10   public forum for political discourse when she used her Twitter

11   account to communicate with the public about her office as a

12   state representative.  The evidence will further demonstrate

13   that she prohibited Mr. Campbell and others with whom she

14   disagrees from participating in that political discourse in

15   violation of the First Amendment.

16          I don't know if counsel wants to make his opening

17   statement, or if we call witnesses?

18          MR. PEARSON:  I'll make mine now.

19          THE COURT:  You can make it now or at the close of

20   plaintiff's case in chief.

21          MR. PEARSON:  I'll give Mr. Hirth credit.  When he

22   said it was going to be short, he was right.

23          I agree with much of what Mr. Hirth said, Your

24   Honor.  This case turns much more on the law than the facts.

25   Our position is, really, just two or three points.

1    First, for there to be a designated public forum, it

2  has to be owned or controlled by the State.  Representative

3  Reisch's Twitter feed is not.  The evidence will be that there

4  is no role at all for the House of Representatives, her

5  employer, or any other state official.  That goes to both --

6  those facts go to both the public forum issue, and also to the

7  question of whether there is action under color of state law

8  because the case is pleaded under 42 U.S.C., Section 1983.

9    We do not dispute the fact that Representative

10  Reisch blocked Mr. Campbell because she didn't like something

11  that he said, so that's not really in dispute.

12    And the final point we'll make is that the evidence

13  is going to be that the restriction on Mr. Campbell's ability

14  to participate is extraordinarily minimal.  All he cannot do is

15  respond directly to a tweet made by Representative Cheri

16  Toalson Reisch, that he can comment on her Twitter feed in

17  response to any tweet by any other person, and that evidence

18  will be before the Court.

19    THE COURT:  Okay, say that again?  I want you to

20  repeat that.

21    MR. PEARSON:  Yeah.  It's a little bit tricky, so

22  let me say it more slowly.  So it's important to --

23    THE COURT:  You didn't say it too fast, I just want

24  you to say it again.

25    MR. PEARSON:  I'll try to say it better, how is

1  that?

2          The restraint here does not mean that Mr. Campbell

3  can never post a comment anywhere on Representative Reisch's

4  Twitter feed.  What he cannot do is respond directly to her,

5  but -- let me give an example, and we'll take it out of this

6  case.

7          THE COURT:  So you're explaining what blocked means.

8          MR. PEARSON:  I'm really explaining what blocked

9  means.

10         THE COURT:  Okay.

11         MR. PEARSON:  And there will be evidence on this,

12  and it may be more clear that way.

13         But it does not -- it's easy to think that the word

14  blocking means more than it actually does, and I think for

15  opening maybe I'll leave my point there.

16         THE COURT:  Okay.  All right.

17         MR. PEARSON:  Thank you, sir.

18         THE COURT:  Thank you.  Okay.  Plaintiff, your case

19  in chief.  Call your first witness.

20         MR. HIRTH:  Thank you, Your Honor.  Plaintiff calls

21  Mike Campbell.

22         THE COURT:  Okay.  Mr. Campbell, if you would come

23  forward, sir.  And I'm going to have you stop right there, turn

24  to my courtroom deputy, raise your right hand, and be sworn.

25                        - - -

1              MIKE CAMPBELL,

2  being first duly sworn by the courtroom deputy, testified as

3  follows:

4              THE COURT:  Thank you, Mr. Campbell.  If you want to

5  have a seat there, sir.

6              THE WITNESS:  Yes, sir, Judge.

7                    - - -

8                DIRECT EXAMINATION

9  By Mr. Hirth:

10 Q.     Good morning, Mr. Campbell.

11 A.     Good morning.

12 Q.     Would you please tell the Court your full name?

13 A.     Michael Ernest Campbell.

14 Q.     And where do you live, Mr. Campbell?

15 A.     I live in Centralia, Missouri.

16 Q.     How long have you lived there?

17 A.     I've lived there since November of -- this time around,

18 I've lived there since November of 2017 or thereabouts.

19 Q.     Where did you live before that?

20 A.     I lived in Columbia where I went to Columbia College

21 and University of Missouri Law School.

22 Q.     Did you grow up in Columbia?

23 A.     I did not.

24 Q.     Where did you grow up?

25 A.     I grew up in Centralia, Missouri.

1  Q.      What do you do for a living, Mr. Campbell?

2  A.      I'm a trial attorney in Columbia.

3  Q.      What kind of law do you practice?

4  A.      I practice primarily injury cases, so auto wrecks,

5  medical negligence, and fall cases.

6  Q.      Would you say you're politically active?

7  A.      I would say that, yeah, I've definitely been

8  politically active in the past.  Much less so recently, but

9  yes.

10  Q.      And in what ways are you politically active?

11  A.      Well, I volunteer for campaigns, I donate, I

12  contribute, and then I also participate in discussions online.

13  Q.      Are you active on social media?

14  A.      Yes.

15  Q.      What platforms do you use?

16  A.      I use Twitter and Facebook.

17  Q.      And for your Twitter account, what is your Twitter

18  handle?

19  A.      @attorneymikec.

20  Q.      Can you briefly explain to the Court how Twitter works,

21  what Twitter is?

22  A.      Yeah, sure.  It's a social media platform where people

23  can communicate with each other through tweets and retweets,

24  and it's basically a huge public forum where lots of ideas and

25  discussions are taking place.  It seems like that is where most

1  of the discussions nowadays are taking place, anyway.

2  Q.     And in what ways do you use Twitter in your daily life?

3  A.     So I'll retweet something I like or agree with.  I will

4  tweet something that I want my followers to see, and I also get

5  on and look at my Twitter feed, which has news stories.  It

6  seems like breaking news is always going to be on Twitter

7  first.

8  Q.     How often would you say you check Twitter?

9  A.     I check Twitter -- I check Twitter daily.

10  Q.     And what -- so Twitter allows you to follow other

11  people; is that right?

12  A.     Yeah, you can follow other people, and you can see what

13  they're tweeting, what they're saying.  It's fascinating.  I

14  mean, people that you wouldn't be able to approach on the

15  street, you can see what they're saying, what their thoughts

16  are.  And you can also communicate with them and, you know,

17  famous celebrities or politicians sometimes will communicate

18  back.

19  Q.     What kind of Twitter users do you follow?

20  A.     I follow a wide variety of Twitter users.  Most of my

21  practice is around safety advocacy, so I follow a lot of people

22  who do things related, tweet things related to safety advocacy.

23  I think that's important, it's where my passion is.  And then I

24  also follow elected officials, and I'd say maybe a few

25  celebrities and probably Royals baseball, you know,

1  personalities.

2  Q.      And do you often post on Twitter yourself?

3  A.      Not recently.  I used to post much more often, but not

4  so much recently.  I've just been too busy.

5  Q.      And do you ever comment on the posts of people that you

6  follow?

7  A.      I do from time to time.

8  Q.      So I'd like you to turn -- we have a book of exhibits

9  there in front of you, and if you'll look first to what's been

10  marked as Exhibit 13.

11  A.      Yes, sir.

12  Q.      And Exhibit 13 is a copy of your Twitter posts; is that

13  correct?

14  A.      That's true.

15  Q.      Now, if we look at the document itself, in the upper

16  left-hand corner, there's a bunch of information.  First it

17  says Mike Campbell, your name.  Below that, the @ symbol, what

18  is that?

19  A.      That is -- that's how people can tweet at me.  They put

20  @, and then my Twitter handle.

21  Q.      That's how you're identified on Twitter.

22  A.      That's how I'm identified on Twitter.

23  Q.      And then below that, you list that you're an attorney

24  in Columbia.  You mention your law office, you mention your

25  kinds of practice.

1  A.      That's right.

2  Q.      And below that, there is a website,

3  mikecampbelllaw.com.  What is that?

4  A.      That's my law firm website.

5  Q.      And then finally it says you joined in July of 2013.

6  Is that when you first joined Twitter?

7  A.      Yes.

8  Q.      Okay.  Now, if you look at the top post here from the

9  day that this was printed, February 23rd, could you read that

10  tweet for us?

11  A.      Yeah.  So that is a tweet that I made, and it says,

12  (quoted as read) "Have never seen this many pack in for a

13  @Centralia_R6," which is Centralia High School, "basketball

14  game for @MonroeCityHigh," which is Centralia's rival.  "Winner

15  advances."  It was a regional game.  "@Kip_Kendrick, where are

16  you at?  Who you got?"

17  Q.      Who is Kip Kendrick?

18  A.      He's a state representative who resides in Columbia,

19  but he's from Monroe City, and we actually discovered we used

20  to play football against each other.

21  Q.      Do you interact with him frequently on Twitter?

22  A.      I do, mostly just because we like to razz each other

23  about Centralia and Monroe City stuff.

24  Q.      Why do you choose to interact with him on Twitter, as

25  opposed to some other medium?

1    A.      It's just easier.

2    Q.      All right.  I'd like to direct your attention to the

3    tweet on February 29, the bottom of that page.  It says Law

4    Office of Mike Campbell, and then there's an @LawLomc?

5    A.      Oh, yeah, sure.

6    Q.      So that's your name, but that's a different Twitter

7    handle than is up at the top.  What's going on there?

8    A.      That's -- I'm retweeting some information from my law

9    firm Twitter, @LawLomc, where we tweeted out some information

10   about Drive Safe, Drive Smart campaign for drivers to stay

11   alert.

12   Q.      So you have separate Twitter accounts for your law

13   office and for you personally?

14   A.      I do.

15   Q.      And it says that Mike Campbell retweeted.  Can you just

16   briefly explain what retweeting is, as opposed to tweeting?

17   A.      Right.  So it's basically like repeating what someone

18   else is saying, except for you actually can repeat it

19   accurately.  So it's retweeting.

20   Q.      Is that something you do frequently, retweet other

21   people?

22   A.      Yeah, I find that a lot easier than coming up with my

23   own ideas.  Usually people tend to say things much smarter than

24   I do and more eloquently.  So...

25   Q.      If you look at the bottom of Page 3, there is another

1  Mike Campbell retweeted Kip Kendrick.

2  A.     Yes.

3  Q.     Can you tell us what that retweet is about?

4  A.     So let's see.  He's tweeting @Mizzou, University of

5  Missouri, saying, "Thank you for being transparent and honest.

6  You sent the right message to student athletes and all

7  Missourians.  Now go fight like hell, knowing we've got your

8  back."

9         And that was the -- that was around the time that

10 the NCAA sanctioned the University of Missouri for

11 self-reporting on some infractions; and instead of writing,

12 tweeting something myself, he seemed to sum up my thoughts, so

13 I retweeted his thoughts.

14 Q.     You said that Mr. Kendrick is a state rep.  What

15 political party does he belong to?

16 A.     He's a Democrat.

17 Q.     Do you only repost posts from Democrats?

18 A.     I do not.

19 Q.     Direct your attention to Page 61, the same exhibit.

20        MR. PEARSON:  I don't believe the pages are marked.

21        MR. HIRTH:  Oh, they're not on the bottom right?

22        THE COURT:  Yeah, they are.  Or at least they appear

23 to be.

24        MR. HIRTH:  Oh, I'm sorry, the bottom left.

25        MR. PEARSON:  Ours aren't.

1          MR. HIRTH:  That must be your copy of it, right?

2  Yeah.

3          THE WITNESS:  What's the date, Mr. Hirth?

4          MR. HIRTH:  Yeah, the date is 11 October 2018.

5          MR. PEARSON:  11 October 2018.

6          MR. HIRTH:  2018.

7          THE WITNESS:  Perfect.  Yeah, I'll find it.

8          MR. HIRTH:  Sixty pages in or so.

9  A.      So I see 10 October 2018, but I don't --

10  BY MR. HIRTH:

11  Q.      Continue to the next page.

12  A.      Oh, okay.  Yeah, all right.

13  Q.      At the bottom of the page?

14  A.      Yeah, 11 October 2018.

15  Q.      And you were retweeting there.  Who are you retweeting?

16  A.      Governor Mike Parson.

17  Q.      And what did you -- what tweet from the governor did

18  you tweet here?

19  A.      So he talks about how Missouri truckers have always

20  been important to our economy, and so he met with some members

21  of the MO trucking industry today about top priorities, which

22  are workforce development and improving infrastructure.  And,

23  you know, he finishes it with, "To meet the demands of the

24  future, we will need more truck drivers and safer roads," and I

25  abundantly agree with that.

1  Q.    And if you'll turn two more pages, at the bottom

2  there's another tweet from the governor that you retweet; is

3  that correct?

4  A.    That's correct.

5  Q.    And what is this one about?

6  A.    So this is Governor Parson talking about a family fall

7  festival, and I thought that people who followed me on Twitter

8  would want to know about it.  It was at the Missouri Governor's

9  Mansion.

10  Q.    And then one more on the next page.  There's another

11  tweet there; is that correct?

12  A.    Yeah, that was one that he had talked about the strong

13  history with the manufacturing sector.  I will retweet things

14  from Governor Parson from time to time.  I like Governor

15  Parson.  I think he's a good guy.

16  Q.    Now I want to turn to the post at issue in this case.

17  So I'll direct your attention to June 23, 2018.  It's Page 79,

18  if they're numbered.

19  A.    I found it by the date.

20  Q.    And it says that you retweeted a tweet from Kip

21  Kendrick, whom you already mentioned; is that right?

22  A.    That's true.

23  Q.    And what was Representative Kendrick responding to?

24  A.    So Representative Kendrick was responding to

25  Representative Reisch.  There was a Boone County Farm Bureau

1  forum where there was -- the Pledge of Allegiance was said, and

2  her opponent, Dr. Maren Jones, put her hands behind her back.

3  And Representative Reisch was openly critical of her for not

4  putting her hand over her heart, and Representative Kendrick

5  was providing context to the situation.  He was explaining

6  that, actually, Dr. Jones comes from a military background, and

7  she was standing at parade rest and that comments like those

8  were beneath the Boone County delegation in which he serves,

9  and I agreed with that sentiment.

10  Q.    And so you retweeted it yourself?

11  A.    I retweeted it.

12  Q.    And what house district do you live in?

13  A.    I live in Missouri House District -- oh, boy.  43, I

14  believe.

15  Q.    44?

16  A.    44, yeah.

17  Q.    And that is Representative Reisch's district; is that

18  correct?

19  A.    That's correct.

20  Q.    She's your state representative.

21  A.    She's my state representative.

22  Q.    All right.  And if you look at that original tweet in

23  Exhibit 1 -- I guess that's what you're already looking at.  If

24  you look at Page -- excuse me.  If you'll look at Page 5 of the

25  original exhibit, of Exhibit 1.

1  A.     Oh, okay.  Yeah, they're numbered on this.

2  Q.     And so this is -- at the bottom of that page, that is

3  the larger version of the original tweet; is that right?

4  A.     That's correct.

5  Q.     And would you just read that for the record, please,

6  that tweet?

7  A.     Yeah, it's a tweet by Cheri Toalson -- Representative

8  Reisch.  "An honor to speak at the Bo Co Farm Bureau Strawberry

9  Festival.  Sad my opponent put her hands behind her back during

10  the Pledge."

11  Q.     And who was her opponent?

12  A.     Dr. Maren Jones.

13  Q.     Were you familiar with Maren Jones at the time?

14  A.     Apparently, I was.  We have a small cat farm, so we

15  have quite a few animals, and Dr. Jones, my wife informed me

16  later, was -- had treated them at one point in time.

17  Q.     And let's look at Representative Kendrick's post, also

18  blown up.  If you would turn to Exhibit 9, it's a larger

19  picture of it.  It's a little easier to read.

20        And this is the response from Kip Kendrick you were

21  saying he posted in response to her?

22  A.     Yeah, that's right.  It says that -- would you like for

23  me to read it?

24  Q.     Yes, please.

25  A.     "Maren's father was a lieutenant colonel in the Army.

1 Two of her brothers served in the military.  I don't question

2 @docjones44" -- that's Dr. Maren Jones' Twitter account.  "I

3 don't question @docjones44 patriotism.  That's a low blow and

4 unacceptable from a member of the Boone County delegation."

5 Q.     Did you agree with Representative Kendrick's tweet?

6 A.     I did.  I mean, I think that Representative Kendrick is

7 a pretty reasonable guy.  You know, he's not going to say

8 anything out of line.

9 Q.     Why did you bother retweeting it on your page?

10 A.     Because I felt like people needed context for what

11 Representative Reisch was tweeting out into the public sphere.

12 Q.     Does retweeting him allow you to reach more people, or

13 what's the point of that?

14 A.     It not only allows me to reach more people, it allows

15 anyone who retweets it to not just reach their followers, but

16 also the followers of the initial post, the initial tweet.

17 Q.     And what happened after you retweeted Representative

18 Kendrick's post?

19 A.     I discovered that Representative Reisch had blocked me.

20 Q.     How did you find that out?

21 A.     I tried to go to her Twitter page, and I couldn't view

22 any of the content.

23 Q.     If you'll turn to Exhibit 11 and tell us what this is

24 an exhibit -- what Exhibit 11 is.

25 A.     It is a notification saying, "@CheriMO44 blocked you,"

 1  and "You are blocked from following @CheriMO44 and viewing

 2  @CheriMO44's tweets."

 3  Q.      And what did you think when you saw it?

 4  A.      I was -- honestly, I was baffled.  I don't know -- I

 5  didn't understand why she would block me for retweeting

 6  something that Representative Kip Kendrick would have posted.

 7  Q.      You said you went to try to go to her page?

 8  A.      I did.

 9  Q.      What happened when you tried to do that?

10  A.      I saw that I couldn't see her tweets or any of the

11  responses.

12  Q.      And were you able to comment in some way on what she

13  tweeted?

14  A.      I was not.

15  Q.      Do you know whether Representative Reisch blocked

16  anyone else besides you?

17  A.      I believe that she had blocked some other people.

18  That's how I discovered that she had been blocking, this was

19  something that she had been doing for a while.

20  Q.      If you'll turn back to Exhibit 9, Representative

21  Kendrick's post.  At the bottom of that page, there's some

22  little icons, it looks like a dialogue bubble that says 4?

23  A.      Yes.

24  Q.      What does that mean?

25  A.      Comments, people who are commenting on Representative

1  Kip Kendrick's tweet.

2  Q.      Does that mean there were four comments?

3  A.      There are four comments, yes.

4  Q.      And if you'll turn the page, what is the first comment

5  that you see?

6  A.      Representative Bruce Franks, he's putting some sort of

7  emojis on there.  I don't know what those emojis are, but he's

8  posting that Representative Cheri Reisch, I believe, blocked

9  him.

10  Q.      And Bruce Franks is also a state rep?

11  A.      He's also a state rep.

12  Q.      And if you'll turn to the next page, actually two

13  pages, there is a comment from a Patrick Sesia?  Do you see

14  that?

15  A.      Yes.

16  Q.      And what does Patrick Sesia comment?

17  A.      "I didn't even have to comment on her post to get

18  blocked," and he's tweeting that to state representatives, and

19  then also Dr. Jones.

20  Q.      And this is a continuation of the dialogue about the

21  original post?

22  A.      That's right.

23  Q.      And if you'll look below that, that reply, there is a

24  red line going down to -- or excuse me, before we get to that,

25  right below Patrick Sesia, there is a comment from

1  Representative Reisch; is that correct?

2  A.      That's true.

3  Q.      And what does she tweet there?

4  A.      (Quoted as read.)  "For being a part of the Boone

5  County delegation, the two Ds weren't even there.  Are we

6  suppose -- are we suppose you don't support farmers?"

7  Q.      And so this is Representative Reisch responding to,

8  directly to Representative Kendrick's criticism of her; is that

9  right?

10 A.      That's correct.

11 Q.      And then there's a red line that goes down from that to

12 an Alexandra --

13 A.      Yes.

14 Q.      -- @aliemalie?  And what does she write?

15 A.      (Quoted as read.)  "Are we suppose that the Farm Bureau

16 is the only mouthpiece for farmers?  Last time I checked, they

17 were an insurance company that supports corporate farming."

18 Q.      And this is aliemalie responding to Representative

19 Reisch responding to Kip Kendrick; is that right?

20 A.      That's right, it's just a big conversation taking

21 place.

22 Q.      All right.  If you'll look back at Exhibit 2, this is

23 the blowup of the -- of Representative Reisch's tweet from the

24 22nd.

25          Now, at the bottom of that first page, there's the

1  little dialogue bubble, and it says 31?

2  A.      That's right.

3  Q.      And you said that that's the number of comments made?

4  A.      That's right.

5  Q.      And if you turn through the next several pages, these

6  are the comments?

7  A.      That's right.

8  Q.      Do you have a comment in there?

9  A.      No, I don't believe so.

10  Q.      Why not?

11  A.      I couldn't comment on this particular thread.  She had

12  blocked me from doing so.

13  Q.      Would you have liked to have taken part in that

14  conversation?

15  A.      Yes, I would have.

16  Q.      Why?

17  A.      Because I think it's important to provide context,

18  especially if we're talking about conversations taking place in

19  a public forum.  And Representative Kendrick had provided some

20  context, but this is an ongoing conversation in what I consider

21  a public forum.  That is important because it's campaign

22  season, and I wanted for her followers -- because if you go

23  back to her initial tweet, there are five people who have --

24  it's a heart symbol, and there are five people who liked it.  I

25  don't know if those people understand the context for what she

1  was saying or not because clearly Dr. Jones was not being

2  unpatriotic.

3  Q.      And so you weren't able to respond to this, but you

4  were able to respond to Representative Kendrick's criticism,

5  weren't you?

6  A.      That's true.

7  Q.      So why isn't that good enough?  I mean, you have a

8  platform out there, you can respond to what he's saying and

9  retweet it.

10  A.      I live in Representative Reisch's district, and I think

11  I should have the opportunity to be able to speak to her

12  followers and people who support her about some of the things

13  that she's saying.  I want her to provide some factual context

14  to that, and the same people who follow her may not follow

15  Representative Kendrick.

16  Q.      And you wanted to reach all of them.

17  A.      I wanted to reach all of them.

18  Q.      So when you discovered that you were blocked and you

19  couldn't participate in this conversation, what did you do?

20  A.      Well, I actually went back and checked a few times, and

21  I can recall because I was sitting on the front porch of my

22  house in my rocking chair, and I thought, you know what?  I

23  don't think that this is right.  And so I thought about my

24  options, and that's whenever I reached out to you, actually.

25  Q.      And you filed this lawsuit.

1    A.      I did file this lawsuit.

2    Q.      Since you filed this lawsuit, have you tweeted about

3    it?

4    A.      No.

5    Q.      Have you engaged with, talked to reporters about it?

6    A.      I have not.

7    Q.      And what about Representative Reisch?  Has she

8    commented on this in the media?

9    A.      Yes, she has.

10   Q.      I direct your attention to Exhibit 12.  This is a press

11   release issued by Representative Reisch --

12   A.      Yes.

13   Q.      -- on July 16, 2018.

14   A.      Yes.

15   Q.      Would you read the headline at the top, please?

16   A.      "Statement from Representative Cheri Toalson Reisch

17   regarding frivolous lawsuit dealing with her use of social

18   media."  And this is on her official letterhead from the state

19   office.

20   Q.      And if you'll look down to the third paragraph in that

21   press release that begins "in regard," could you read that to

22   us, please?

23   A.      The whole third paragraph?

24   Q.      Yes.

25   A.      "In regard to the frivolous lawsuit filed by Mr.

1    Campbell, I consider it to be a publicity stunt rather than an

2    earnest attempt to address an issue with my office.  Mr.

3    Campbell has never," underlined, "reached out to me by e-mail,

4    phone call, traditional mail, or by a visit to my office.  He

5    has many avenues to communicate with me as a state

6    representative, but his intent has never been to share his

7    thoughts with me.  His only goal is to gain attention for his

8    politically-motivated stunt.  The fact he has inaccurate dates

9    in his lawsuit and falsely accuses me of blocking one of my

10   colleagues in the legislature underscores the disingenuous

11   nature of his actions."

12    Q.      So a couple things there.  Why didn't you reach out to

13   Representative Reisch by e-mail or by phone?

14    A.      She wasn't having this conversation by e-mail or by

15   phone.  She was having this conversation on Twitter.

16    Q.      So you were just following the forum she started it in.

17    A.      She elected the forum, and I chose to participate in

18   it.

19    Q.      And she refers to this as a politically-motivated

20   stunt.  Did you do this as a politically-motivated stunt?

21    A.      No, I did not.

22    Q.      Isn't it fair to say -- you're a lawyer in the area.

23   Doesn't this raise your profile?

24    A.      No, this is about the worst possible -- well, I don't

25   want to say it's the worst possible thing that I could do for

my profile.  But I try cases in Boone County, Missouri, which
is a fairly right-leaning county, and we draw people from
throughout the county to our venire panels.  And the last thing
that I want for my client whenever I'm trying a case is for
someone on the jury pool to say, oh, you're that crazy liberal
who has warrants out for his arrest, who filed this suit
against a good conservative like Representative Reisch.  This
is about the last possible thing that I would want to do to
advance my career.

Q.      So why did you do it?

A.      Because it was the right thing to do.

Q.      Now, in addition to this press release, did Ms. Reisch
talk to the media that you're aware of?

A.      She talked to the media regularly, yes.

Q.      And if you'll look at Exhibit 1 again, the very first
page, the third tweet down, could you read that for us?

A.      "Polititgation from the liberal, dirty playbook.
Copycats with no new ideas or solutions."  She's retweeting a
popular radio station in the area that says, "@CheriMO44 bashes
the Twitter lawsuit against her, calling it polititgation."

Q.      And it says 93.9 The Eagle?

A.      Yes.

Q.      Is that a -- that's a radio station?

A.      It is.  It's a very popular radio station in
mid-Missouri.

1   Q.     Did you happen to hear that broadcast?

2   A.     I heard a broadcast, yes.

3   Q.     And did Representative Reisch talk about you on the

4   radio in that case?

5   A.     As I recall, the very first words out of her mouth was,

6   this is a guy who has warrants out for his arrest, who doesn't

7   know that Missouri is a state, and some other things about my

8   character.

9   Q.     Are any of those statements true?

10  A.     I do not have warrants out for my arrest.  I am aware

11  that Missouri is a state, I'm a practicing lawyer here.  So I

12  believe I may have misspoke once and corrected myself.

13  Q.     Are you seeking monetary damages from Ms. Reisch in

14  this case?

15  A.     I'm not.

16  Q.     What are you asking the Court for?

17  A.     For her to -- well, I'm asking the Court to enjoin her

18  from blocking people on her Twitter page.

19  Q.     Why is that important to you?

20  A.     Because I think democracy only functions whenever we

21  have free ability to discuss the facts and to listen to other

22  people, to have context, hear the truth, and, you know, in this

23  day and age, it seems like there's not a disinterest for that,

24  a lack of interest.  It's almost like there's a contempt for

25  it, to hear what the other side has to say or to understand the

1 context of something.  And this is where the modern generation
2 of people are having these conversations; and so if we're going
3 to silence someone from providing a different viewpoint, then I
4 don't know what that means for democracy.
5       MR. HIRTH:  Thank you.  No further questions.
6       THE COURT:  Thank you.  Mr. Pearson, cross?
7       MR. PEARSON:  Thank you, Your Honor.
8                         - - -
9                   CROSS-EXAMINATION
10 By Mr. Pearson:
11 Q.     Mr. Campbell, I'm Lowell Pearson.  Let's start sort of
12 where we ended and then work our way back.
13        So would you take a look at Exhibit 12, please?
14 A.     Yes.
15 Q.     That's the press release.  Tell me when you have that
16 in front of you, please.
17 A.     I do.
18 Q.     So you read from Paragraph 3, so I'm going to ask you a
19 factual question, which is -- the second sentence of the third
20 paragraph, I'll read that just so we're clear.
21        "Mr. Campbell has never reached out to me by e-mail,
22 phone call, traditional mail, or by a visit to my office."
23        Is that correct?
24 A.     That's true.
25 Q.     You said that you -- publicity about this case might

1  harm your practice because Boone County is right-leaning.  Did

2  I get that right?

3   A.     Yes.

4   Q.     And you're obviously politically active in Boone

5  County, so I'm going to ask you a couple of questions about

6  elected officials in Boone County and see if you know who these

7  people are.

8   A.     True.

9   Q.     Do you know the political party of the three

10  commissioners in Boone County?

11  A.     Yeah, they're -- two are Democrats, and one is a

12  Republican.

13  Q.     What about the county clerk?

14  A.     She's a Democrat.

15  Q.     In fact, she defeated a Republican incumbent in 2016,

16  correct?

17  A.     That's true.

18  Q.     That's a Brianna Lennon.

19  A.     That's true.

20  Q.     She's a former law partner of yours.

21  A.     She was not a law partner of mine.

22  Q.     Brianna Lennon is a Democrat?

23  A.     She is a Democrat.

24  Q.     What about the county recorder, Republican or Democrat?

25  A.     And if I could, I just want to make sure that's clear.

1  She was an associate.  She did work at my law firm.

2  Q.      Thank you.

3  A.      Yeah.

4  Q.      I appreciate that.

5  A.      Yeah, no problem.

6  Q.      What about the county recorder?

7  A.      I believe she's a Democrat.

8  Q.      The assessor.

9  A.      Democrat.

10  Q.      Do you know of -- other than the one person you

11  identified, one of the commissioners, do you know of any

12  Republican who holds a county office in Boone County?

13  A.      Just county officials?

14  Q.      Yes.

15  A.      I do not.

16  Q.      So what's the factual basis for your conclusion that

17  Boone County is right-leaning, given the fact you've just

18  testified that it's only elected one Republican county-wide?

19  A.      In 2016, Caleb Rowden won the Senate seat there.

20  Before him, Kurt Schaefer was the state senator, who were both

21  Republicans.  Representative Reisch is my representative, she's

22  a Republican.  Representative Sara Walsh is also a Boone County

23  Republican who represents the district.  Representative Chuck

24  Basye, who represents, what, the 47th?  So the northeast part

25  of the -- northwest part of the county is also a Republican.

1      A Republican sits as a judge, defeated a Democrat in

2  2018.  That would be Republican Judge Brouck Jacobs.  There's

3  also Republican Judge Kevin Crane.  And I'm not sure if Sue

4  Crane is also an associate circuit judge of Boone County, I

5  believe she might be, but she's also a Republican.

6  Q.      You're aware that many of those state senators and

7  representatives that you identified, their districts are not

8  solely within Boone County, right?

9  A.      They are not solely within Boone County, that is

10  correct.

11  Q.      Thank you.  You talked a little bit about --

12         THE COURT:  Let me ask this question.  Is that going

13  to be of any relevance?  You all are hitting on this.  Is it

14  any relevance to this Court what Boone County is, persuasion,

15  Democrat?  If so, in the end, I want to know that.  Otherwise,

16  we're spending a lot of time on things that are not going to be

17  relevant to this Court's decision on what I have to decide.  If

18  it is, that's fine.  But if it's not, we probably need to move

19  forward.

20         MR. PEARSON:  I'm going to move on anyway, Your

21  Honor.

22         THE COURT:  Thank you.

23         MR. PEARSON:  But I will say I don't think it is.

24         THE COURT:  Okay.

25         MR. PEARSON:  But since Mr. Hirth elicited the

1  testimony, I feel it's my obligation to make a complete record

2  on cross-examination.

3         THE COURT:  I wasn't compelled by his statements,

4  and I was going to ask him the same thing.  Unless it makes an

5  impact on what I rule, I think we should move and stay away

6  from those things.  Let's hear the facts that relate to --

7         MR. PEARSON:  Fine with me.  I did not make a

8  relevance objection, which perhaps I could have and should

9  have.  But we'll move on.

10         THE COURT:  I'll make it myself next time just from

11  the bench so we can streamline and get to the issues that are

12  going to help this Court decide this case.

13         MR. PEARSON:  Fair enough.  Fair enough.

14  BY MR. PEARSON:

15  Q.     Mr. Campbell, you talked a little bit about your

16  understanding of Twitter, so I've just got a couple of

17  questions for you about that.

18  A.     Sure.

19  Q.     Can you tell us with as much precision as you can what

20  your understanding of what being blocked means?

21  A.     I cannot see any tweets that Representative Reisch puts

22  or communicates to people on her Twitter page.

23  Q.     And I suppose if you can't see them, you can't respond

24  to them; do I have that right?

25  A.     That would be correct.

1   Q.      Now, let's use the example, just to be clear here, if
2   Representative Kendrick, who is not blocked, follows
3   Representative Reisch and he posts something in response -- a
4   comment about a tweet of hers, you can see what Representative
5   Kendrick's response to Representative Reisch was, correct?
6   A.      As long as I'm not blocked by Representative Kendrick,
7   that would be correct.
8   Q.      And you're not right now.
9   A.      I am not.
10  Q.      And you can also comment in response to Mr. -- or to
11  Representative Kendrick's tweet, correct?
12  A.      Sure, I can comment and retweet, yes.
13  Q.      Okay.  You said you moved into the district or moved
14  into Centralia in November of 2017?
15  A.      Yeah, thereabouts.
16  Q.      Did you register to vote there?
17  A.      I registered to vote before the next election, so that
18  would have been the next year, I assume.
19  Q.      I'm not trying to trick you here.
20  A.      I don't know.
21  Q.      If I told you it was April 2018, would that be right?
22  A.      That wouldn't surprise me, yeah.
23  Q.      You don't own your own Twitter account, right?  You
24  have no ownership interest in that account.
25  A.      I don't know that I could sell it to somebody else,

1  yeah.

2   Q.      And is that true, to your knowledge, of every Twitter

3  user?

4   A.      To my limited knowledge of Twitter, yes.

5   Q.      Do you know whether elected officials like

6  Representative Reisch have any greater rights or opportunities

7  under Twitter than a private citizen like you?

8   A.      I don't know the answer to that question.

9   Q.      Are you familiar with the fact that Twitter has what

10  are called terms of use?

11  A.      Yes.

12  Q.      And just to kind of move things along, would you agree

13  with me that those define the permissions that users have and

14  that those permissions come from Twitter?

15  A.      I would agree with that.

16  Q.      And just generally, could you tell us your

17  understanding of those terms of use?  Not a lot of detail is

18  needed.

19  A.      Sure.  I don't think that you can threaten or defame or

20  be obscene to someone.  I don't know the full details, but

21  that's my understanding, just from seeing the news about it.

22  Q.      So the terms of use are the rules that Twitter imposes

23  on its users; is that a fair statement?

24  A.      I would -- yeah.  I would suppose so, yes.

25              MR. PEARSON:  Your Honor, may I have one moment to

1  confer with my client?

2      THE COURT:  Sure.

3      (So done.)

4      MR. PEARSON:  No further questions, Your Honor.

5      THE COURT:  Thank you.  Any redirect?

6      MR. HIRTH:  I have no redirect, Your Honor.

7      THE COURT:  Thank you, Mr. Campbell, you can stand

8  down.

9      Plaintiff, call your next witness.

10      THE WITNESS:  Thank you, Judge.

11      MR. HIRTH:  Plaintiff calls Cheri Toalson Reisch.

12      THE COURT:  Okay.  I'm going to have you sworn by my

13  courtroom deputy right there.

14                        - - -

15                  CHERI TOALSON REISCH,

16   being first duly sworn by the courtroom deputy, testified as

17  follows:

18                        - - -

19                  DIRECT EXAMINATION

20   By Mr. Hirth:

21  Q.    Good morning, Representative Reisch.  Could you please

22  tell the Court your full name?

23  A.    Cheri Gail Toalson Reisch is my full legal name.

24  Q.    And you are a state representative; is that correct?

25  A.    Correct.

1  Q.      What district do you represent?

2  A.      44, not 43.

3  Q.      What area does that cover?

4  A.      Northeast Boone County and southeast Randolph County.

5  Q.      And you have a Twitter account; is that correct?

6  A.      One my nephew Erik set up for me.

7  Q.      If you'll look at Exhibit 1, this is, as we said

8  previously, a printout of your Twitter page; is that correct?

9  A.      Correct.

10  Q.      And in the upper left-hand corner, that is your name,

11  Cheri Toalson Reisch.

12  A.      Correct.

13  Q.      And below that, it says @CheriMO44.  Is that your

14  Twitter handle?

15  A.      That's the one my nephew Erik set up for me.

16  Q.      And MO44 refers to the district you represent in the

17  House of Representatives, correct?

18  A.      Correct.

19  Q.      And below that, you identify yourself as a MO State Rep

20  for 44th District; is that correct?

21  A.      No, it states Christian, comma, Missouri state rep

22  District 44, comma, mother, comma, grandmother, and then an

23  abbreviation for Philippians 4:13, which means I can do all

24  things through Christ, who strengthens me.

25  Q.      And if you'll look just below that, there is a circle

1  sort of with a -- one end of it that's pointy.  It says

2  District 44, Missouri USA; is that correct?

3   A.     Correct.

4   Q.     That also refers to your House district, doesn't it?

5   A.     Correct.

6   Q.     And then below that, it says cheri44.com.  What is

7  that?

8   A.     My nephew Erik put that on there.  It's a link to my

9  official Facebook page, not my other Facebook page.

10  Q.     And it's to your Facebook page?

11  A.     I mean -- I'm sorry.  Website.

12  Q.     Website.

13  A.     Website, excuse me.

14  Q.     Your campaign website; is that correct?

15  A.     Correct.

16  Q.     And then below that it says that you joined Twitter

17  September 2015; is that correct?

18  A.     That's when my nephew set it up for me.  I'm old school

19  grandma, and he's a millennial and came to me and said, hey,

20  Aunt Cheri, you should get out on Twitter.  And I'm like, I

21  don't know anything about Twitter.  So he said, well, I'll set

22  it up for you, I'll do it.  And he did a lot of the tweets for

23  me, and he set everything up for me.  I didn't know the first

24  thing about Twitter.

25  Q.     In fact, you created the Twitter account to launch your

1  campaign for the seat in the House; isn't that right?

2   A.    No, I didn't create it, my nephew did.

3   Q.    But he created it for that purpose, for your run for

4  the House.

5   A.    He just thought I needed to get out in the social media

6  world.  He was back from three tours in Iraq, and he had time

7  on his hands and needed something to do while he was finishing

8  a master's degree at MU, so he said he would just do it.

9   Q.    If you'll turn to the second to the last page of

10  Exhibit 1.  It's Page 104 if the pages are numbered.  Are you

11  there, ma'am?

12   A.    Correct.

13   Q.    And the very first tweet, it's the third on the page

14  but the earliest one of them, 21 September 2015, could you read

15  that, please?

16   A.    (Quoted as read.)  "Jobs and education are my highest

17  priority for #Missouri's District 44," and it links to a

18  *Columbia Missourian* article, it looks like.

19   Q.    And then what about the one right below that?

20   A.    (Quoted as read.)  "I'm proud to be featured in the

21  *Columbia Tribune*."  But I didn't send those tweets, my nephew

22  did.

23   Q.    Does your nephew always post your tweets?

24   A.    In the beginning, yes, and then later on as he taught

25  me how to do it, I would do probably more of the recent ones.

1   But in the beginning, these are dated 2015, he just did it for

2   me.

3    Q.    Now, over the next year after this account was created,

4   you used your Twitter account to campaign for a seat in the

5   House; isn't that right?

6    A.    That's only part of my life.  I have multiple jobs and

7   a family and children and grandchildren and a church family.

8   So this is -- this one picture on Page 100, for example, I was

9   vice-president of the Hallsville Chamber of Commerce for years,

10  and I was mayor, so this is me as mayor presenting Chamber of

11  Commerce awards.  So it's only one part of my life, not my

12  whole life.  I work four jobs seven days a week.

13   Q.    If you'll turn to Page 94, and that is dated -- the

14  third tweet on that page is dated February 23, 2016.  Could you

15  read that tweet for us?

16   A.    (Quoted as read.)  "It's official.  Join Team Cheri to

17  help me bring your voice to the capitol."

18           And down at the bottom, I get to talk about the

19  Anchor Festival in Centralia, the AB Chance Company that I go

20  to every year with my kids and grandkids.  I used to go with my

21  grandma since its inception.

22   Q.    And if you turn back one page to 93, look at the tweet

23  at the top of that page.  Could you tell us what that is?

24   A.    So that is an invitation to my campaign kickoff, and

25  below that is where I give blood.  You'll see on my Twitter

feed and Facebook, I'm a lifelong blood giver. I give gallons

and gallons and gallons of blood. So you can see below what

you're referencing to where I'm giving blood to the Red Cross

to save people's lives. So you can see my Twitter is a

multitude of different facets of my life and not just one facet

only.

Q.     And now if you'd turn to Page 42, please. It's a tweet

dated 8 November 2016, the bottom one on the page. Could you

read that for us?

A.     Okay. Bottom of 42?

Q.     Bottom of 42, yes, ma'am.

A.     (Quoted as read.) "Victory. Surrounded by family and

friends. I will represent the 44th District. Let's get to

work." That's election night with my nephew Erik that I keep

referring to, and my brother.

Q.     And that was the day that you won the election,

correct?

A.     Correct. Family is a very important part of my life.

Q.     And then on Page 40, at the bottom of that page, you

write, "Today I was humbled to commit myself to represent

everyone in the 44th District and uphold the Constitution of

Missouri"; is that correct?

A.     Yeah. But you know what's better yet is the one above

that says, "Inspiration: God put people like my firefighter

father, Dale Toalson, in my life. He still inspires me with

1  his lessons of selfless service."  And it has the picture of

2  the Boone County Fire Protection District statue that he helped

3  found, and I'm a founding CERT member of the fire district

4  also.  So firefighters are very dear to my heart.

5  Q.      And after you took office, you continued to use your

6  Twitter account to communicate with your constituents about

7  your work as a state rep; isn't that correct?

8  A.      No, I really use Twitter -- I follow 59 people because

9  I like to see what other people have to say, and not so much

10  that I tweet very much at all.  Especially, you know, when I'm

11  busy, which is all the time.  So I'm rarely on Twitter, I

12  rarely look at Twitter, I rarely use Twitter, and I rarely

13  tweet.

14  Q.      If you'll look at Page 36, please?  At the second to

15  the bottom tweet on that page, March 1, 2017, (quoted as read)

16  "100 more jobs in the 44th District.  Welcome to MO."  That is

17  your tweet, correct?

18  A.      Yeah, what's awesome about that was I was the Economic

19  Development Director for Hallsville, and I served on the

20  Regional Economic Development Board for 24 years.  And so Boone

21  County, my hashtag of life has been jobs, jobs, jobs.  And our

22  motto at REDI is to attract new businesses, to expand existing

23  businesses, and to retain.  And so jobs in Boone County are

24  very important to me and have been for about 35 years.

25          I've only been an elected rep for three, so for

1  three decades, it's been all about jobs in Boone County.  And I

2  talk a lot about jobs on my Twitter, Facebook, personal life.

3  And you can just ask the media or any news articles, you will

4  see me say jobs, jobs, jobs, because that's what it's about,

5  and that's been my goal in life since I've been in government

6  for 36 years.  So...

7  Q.     If you would look at Page 22, the top of that page.

8  It's 16 August 2017.  You write, (quoted as read) "I testified

9  before the Senate today to repeal prevailing wage.  Save

10  taxpayers' money, helps schools, cities, et cetera."

11         You're referring to your testimony in the Senate

12  chamber; is that correct?

13  A.     So previous to this job, I was a city clerk for 30

14  years, and then a mayor for four, and I've had to deal with and

15  work with prevailing wage on public works projects for, like,

16  roads, water, sewer, et cetera, parks.  And prevailing wage

17  adds to the cost to the taxpayer.  And I'm a taxpayer watchdog,

18  and so I have always ran on prevailing wage reform, which we

19  did pass some, and so it will save taxpayers money, and I've

20  been passionate about that for about 38 years now.

21  Q.     When you testified, you weren't testifying as a city

22  clerk, were you?

23  A.     Yes, actually, I had told them that as a former city

24  clerk and mayor, because it is not a custom for a state

25  representative to testify in a Senate hearing.  They actually

1  prefer that you not.  Because I went there and said I am here,

2  not as a state representative, I am here as a former mayor and

3  city clerk that deal with prevailing wage from A to Z, start to

4  finish.  That's what I testified on behalf of was governmental

5  agencies.

6  Q.     On June 22, 2018, you spoke at a Farm Bureau event in

7  Boone County; is that right?

8  A.     Yes.

9  Q.     And you tweeted about that event, as well; isn't that

10 correct?

11 A.     Yes.

12 Q.     If you'll look at Exhibit 2, this is your tweet from

13 that day?

14 A.     Yes.

15 Q.     You wrote, "An honor to speak at the Bo Co Farm Bureau

16 Strawberry Festival.  Sad my opponent put her hands behind her

17 back during the Pledge."

18         What are you referring to when you talk about your

19 opponent?

20 A.     Well, her name is pronounced Maren, like the bird,

21 wren.  It's Maren Bell Jones, and that's who I'm referring to.

22 Q.     And you were referring to, you say that she didn't --

23 that she put her hands behind her back during the Pledge?

24 A.     Yeah.  I think it's self-explanatory, sir.

25 Q.     Why did you feel the need to write that?

1  A.      Because I felt it was sad.

2  Q.      And why did you feel it was sad?

3  A.      Because my father served in the military also, my

4  grandfather served in the military; and I respect the flag and

5  the United States of America and the constitutional republic

6  that we are, and I was taught from at grade school, you put

7  your hand over your heart and recite the words.

8  Q.      Did you believe that Dr. Jones was being disrespectful?

9  A.      I just said it was sad.  I could let people form their

10  own opinions.

11  Q.      The next day your colleague, Kip Kendrick, criticized

12  your tweet on Twitter, didn't he?

13  A.      He did.

14  Q.      And if you'll look at Exhibit 9, this is the tweet he

15  wrote in response; is that correct?

16  A.      Let me see if I can find Exhibit 9.  I'm sorry, I'm

17  seeing Exhibit 8.  Let's see.  Okay.  Exhibit 9.  I found it.

18  I'm sorry.  Could you repeat the question, please?

19  Q.      Yes.  This is the tweet by Kip Kendrick in response to

20  your tweet about Dr. Jones; is that right?

21  A.      Yes.

22  Q.      And he questioned your questioning her for being

23  unpatriotic; is that fair?

24  A.      He just said he didn't question her patriotism.

25  Q.      But it's fair to say he's criticizing you for doing

1  that, isn't it?

2  A.      Possibly.

3  Q.      And then my client, Mike Campbell, retweeted this;

4  isn't that correct?

5  A.      That's what's alleged.

6  Q.      You don't know whether he did?

7  A.      Yeah, I didn't know it -- didn't know at the time until

8  after I was served with the lawsuit.

9  Q.      But you did block him from your Twitter account, didn't

10 you?

11 A.      I blocked several people that Saturday morning after

12 this event Friday night because a state representative called

13 me a liar and that I lie on the House floor.  And my personal

14 Twitter account on my personal phone with a Gmail account is my

15 private Twitter, and just because people have the right to

16 speak doesn't mean I have to lose my right to listen.

17      It is not a public forum, and if they want to shout

18 to the rooftops, they can.  That doesn't mean I have to listen.

19 If they call me a liar in person, I can walk away.  I don't

20 have to be bullied.  If they call me on the phone and call me a

21 liar, I will hang up.

22 Q.      If they call you a liar on Twitter, you can turn off

23 your computer, can't you?

24 A.      It's on my phone.  I can block them or mute them, or

25 I'm thinking I'll just delete my Twitter account and have no

1 Twitter account. I'm old school. I'm a grandmother. If
2 people want to contact me, they can call me on the phone, they
3 can use e-mail, they can write a letter. I have office hours.
4 I do forums and events in Centralia. I'm in Centralia all the
5 time.

6          He drives within two blocks of my house. I'd never
7 heard of this guy. I don't even know him, never met him. You
8 know, he said he was in the capitol testifying on a bill, but
9 he doesn't even know I have an office in the capitol. He
10 became -- I became his state rep two months before he filed
11 this lawsuit. He's never -- this is the first time I've ever
12 met the guy. At least I have the right to see my accuser for
13 the first time ever.

14 Q.     Representative Reisch, you said that you blocked a
15 number of people the following morning; isn't that correct?
16 A.     Yeah, after being called a liar. I don't have to
17 listen to it. Saturdays are busy days for me. I take care of
18 a disabled brother --
19 Q.     Did Mike Campbell call you a liar?
20 A.     -- I work four jobs.
21 Q.     Ma'am, did Mike Campbell call you a liar?
22 A.     I didn't block Kip Kendrick. He just retweeted
23 something from Kip. I blocked people who I did not know. I
24 did not know this guy. I still don't know this guy, except
25 what a Google search can tell me about him. So why do I have

1  to have people on my personal Twitter that I don't know

2  anything about who they are or anything.  It's my Twitter.

3  Q.      In fact, you've blocked over 100 people from your

4  Twitter account; isn't that correct?

5  A.      Since 2015, and some of those people write in Arabic,

6  from, like, Saudi Arabia princes.  I don't need to look at

7  them.  I don't need to see Arabic because I don't read Arabic.

8  Some were Nigerian, I don't know, people that they couldn't

9  even talk broken English on Twitter.  And I'm like, I don't

10  know these people, I don't need to listen to these people.  It

11  clutters up my feed, it clutters up my life.

12          I follow 59 people.  There's 59 people on my Twitter

13  feed.  I care what they have to say, I want to read what they

14  have to say, and that's all I care about.  I don't care about

15  anyone else in the billions of Twitter users because Twitter is

16  just something I look at.  I rarely tweet on my personal

17  Twitter account.

18  Q.      Isn't it true that most of the people you blocked on

19  Twitter are political opponents of yours or people who disagree

20  with you politically?

21  A.      No, not at all, because I don't know who these hundred

22  people were.  How would I know what their political affiliation

23  is?  In fact, usually they say where they're from, like

24  Timbuktu or some other state.  I don't care what people in

25  other states have to say.  I don't care what people that I

1  don't know have to say.  Just because I'm an elected official

2  doesn't mean I have to listen to people.

3  Q.      If you'll look at --

4  A.      I can walk away.

5  Q.      If you'll look at Exhibit 5, this is the list of people

6  who have been blocked from your Twitter account, correct?

7  A.      I printed that out the day after I got the lawsuit.

8  Q.      And if you'll --

9  A.      You know, my nephew could have blocked some of these, I

10 could have blocked some of these.  There's names on here -- I

11 don't even know 99 percent of these people.  Who are these

12 people?

13 Q.      If you'll look at Page --

14 A.      I've never heard of them.

15 Q.      -- 7, please?  You'll see about halfway down the page

16 PROMO Missouri?

17 A.      These pages aren't numbered.  Did you say the seventh

18 page?

19 Q.      Seventh page, yes.

20         MR. PEARSON:  Andy, can you just give her the

21 number?

22 A.      Could you tell me what's at the top of it so I know I'm

23 on the correct page?

24 BY MR. HIRTH:

25 Q.      Yeah, the top is IWF Verified account.

1  A.     Okay.  What does that mean?  I don't even know what IWF

2  Verified account is.

3  Q.     About halfway down, one of the account users you

4  blocked is PROMO Missouri.  Do you see that?

5  A.     Yeah, I don't know who Ralph Henning is, I don't know

6  who Becky is.

7  Q.     Do you know who PROMO Missouri is?

8  A.     Not exactly.  I think it's an LBGTQ, but I don't know

9  them.  I don't need to follow them, I don't need to see what

10 they have to say.

11         I don't know who Pamela, CoMoPamMIZ is.  I don't

12 know who Ms. Smokey Mannington is.  I don't know who 99 percent

13 of these people are.  Who is Trump's Boss?  Who is Justin

14 McElwain?  Who is Arturo Diaz?  Who is Chris Gorka?

15         THE COURT:  Okay, Ms. --

16 A.     Who is Salaam Enani?

17         THE COURT:  Ms. Reisch, here is how this has to go.

18 The attorney will ask the question, and then just respond.

19 Your attorney will have an opportunity for clarification on

20 anything you need.  So when we just go on and on and there's

21 not a question posed -- so, and I understand that --

22         THE WITNESS:  I'm a little nervous, sir.  Sorry.

23         THE COURT:  And I understand that, and that's fine.

24 And anything -- your attorney will have an opportunity to ask

25 you questions to clear up anything or to let you kind of go

1   further.  But right now in terms of Mr. Hirth who asks, just

2   answer the question as best you can.  I'll let you expound on

3   it if you need to, and we'll go that way.

4            THE WITNESS:  Thank you, Your Honor.

5            THE COURT:  Thank you.

6            MR. HIRTH:  Thank you, Your Honor.

7   BY MR. HIRTH:

8   Q.      If you'll look at Page 9, so two pages after where we

9   just were.

10  A.      Who is at the top so I'll know what --

11  Q.      ERG Rhino.  And the -- have you found that page, ma'am?

12  A.      No.  I'm almost there.  I found it.

13  Q.      And three names down, it says Karen @GunSenseMO_Mom.

14  Do you know why you blocked Karen @GunSenseMO_Mom?

15  A.      I don't know Karen or any of the other people on that

16  page, sir.

17  Q.      If you'll look at Page 15, which at the top, first

18  tweet -- or the first name on that page is Justin.

19  A.      Okay.  I'm there.

20  Q.      And the third name down, Progress Missouri @ProgressMO,

21  you blocked them.  Do you know why?

22  A.      No.  But I also blocked a Justin, an Alison, an Amy,

23  and a Deborah.

24  Q.      And if you'll look at Page 19, which at the top has

25  Race_Matters_Friends?

1   A.      Same answer.

2   Q.      You blocked Race_Matters_Friends, correct?

3   A.      That's what it appears.

4   Q.      Do you know why you blocked them?

5   A.      No, but also I blocked all the other people on that

6   page, Planet of the Opes, et cetera.

7   Q.      And the next page, second person down, Brianna Lennon?

8   A.      Now, I do know Brianna when she was running for county

9   clerk.  So, yeah.

10  Q.      She was another candidate for office at the time?

11  A.      Correct.

12  Q.      Okay.  And as a result of blocking each of these users,

13  they're not able to see or comment on your tweets; isn't that

14  correct?

15  A.      Correct, but they can tweet and comment on anywhere

16  else in the world they want to.  They can tweet on their own

17  Twitter.  They can shout to the world or anything else they

18  want to do.

19  Q.      After you blocked Mr. Campbell on Twitter, he filed

20  this lawsuit against you, correct?

21  A.      Correct.

22  Q.      And that made you pretty angry, didn't it?

23          MR. PEARSON:  Objection, irrelevant.

24          THE COURT:  What's the relevance?

25          MR. HIRTH:  Well, Your Honor, I want to talk about

1 her responses to the lawsuit as a form of retaliation.

2 MR. PEARSON: Your Honor, there's no retaliation

3 claim pleaded, so --

4 THE COURT: If you could object on your feet,

5 counsel.

6 MR. PEARSON: Sorry, Your Honor. There's no

7 retaliation count pleaded, so I'm not sure that anger and --

8 THE COURT: Agreed, sustained. Unless there's some

9 reason to go into it, I sustain the objection.

10 MR. HIRTH: Thank you, Your Honor.

11 BY MR. HIRTH:

12 Q. We looked a little bit earlier at a press release that

13 you issued in this case. That was Exhibit 12. Are you there,

14 ma'am?

15 A. Yes, I am.

16 Q. Okay. And if you'll look at the second paragraph

17 there, the one that begins "as a state representative," could

18 you read that paragraph for us?

19 A. (Quoted as read.) "As a state representative who

20 proudly serves the good people of the 44th District, comma, my

21 door is always open. I am accessible by phone or e-mail at all

22 hours of the day, and I attend numerous public forums

23 throughout the year in an effort to give my constituents as

24 many opportunities as possible to share their opinions with me.

25 As a grandma who sometimes struggles with technology, it is

1  fair to say that I don't understand all of the nuances of

2  social media and that I am far more comfortable with

3  traditional forms of communication, like face-to-face meetings

4  or a phone call.  However, it is important to understand that

5  any action I've taken on social media has never been done with

6  the intent of silencing the voice of a constituent, but instead

7  to avoid the name-calling and vitriol that all of us who use

8  social media know is far too common."

9          Because when I blocked Mr. Campbell, I did not know

10 he was a constituent.

11 Q.      Now, ma'am, you say you -- everything you've done on

12 social media has never been with the intent of silencing the

13 voice of a constituent.  That's what you said?

14 A.      That's what it says there.  That was written July 16,

15 2018.

16 Q.      And instead it was to avoid name-calling and vitriol;

17 is that correct?  That's what you just read?

18 A.      Yeah, I get that all the time.  I'm a public official.

19 I've had assassination threats and everything else against me,

20 my tires punctured.  It's part of the job description.

21 Q.      Has Mr. Campbell ever called you names on Twitter?

22 A.      I don't know.

23 Q.      You don't know?

24 A.      I don't know.  I don't know the guy.  I've never met

25 him until today.

1  Q.      Has he subjected you to any vitriol?

2  A.      I don't know.

3  Q.      So, in fact, you didn't block him to prevent

4  name-calling or vitriol, did you?

5  A.      Could you repeat the question?

6  Q.      Well, you just said -- I asked you if he ever called

7  you names or used vitriol, and you said you didn't know.  And

8  I'm asking, so you didn't block him, then, because of

9  name-calling and vitriol, did you?

10  A.      He wasn't the person that called me a liar that

11  Saturday morning.

12  Q.      So you blocked Mr. Campbell because Mr. Franks called

13  you a liar?

14  A.      I was upset that morning because my disabled brother

15  was having a difficult day, and so I really didn't need to be

16  distracted.  And so, you know, again, people can talk all they

17  want.  That doesn't mean I have to listen.

18  Q.      And you said you wanted to keep the lines of

19  communications open so that your constituents could share

20  thoughts and concerns with you.  That's your job, isn't it, as

21  a state rep?

22  A.      So I receive probably close to a hundred e-mails a day,

23  and I keep a phone log of all of the phone calls that come into

24  my office.  And Mr. Campbell has never reached out to me.  I

25  not only get calls from constituents, but from all over the

1  state.  And he says he's been in the capitol building, but he's

2  never come to see me.  I'm in Centralia all the time at events.

3  He's never talked to me in my life.

4  Q.    Isn't it true that Twitter is one of the ways that you

5  communicate with your constituents?

6  A.    No.

7  Q.    You don't ever communicate with constituents on

8  Twitter.

9  A.    No.  In fact, most of my friends and constituents

10  aren't on Twitter.  That is the last way I could communicate

11  with my constituents.  I'm more face to face in person.  I'm

12  everywhere all the time.  I sometimes have three or four events

13  a day all over my district.  No, I use Twitter to see what's

14  going on in other people.

15  Q.    This press release wasn't the only time you talked with

16  the press about Mr. Campbell; is that right?

17  A.    I'm open with the press.  They know my door is always

18  open.  In fact, we have press in Columbia, they all have my

19  personal cell phone number.  They can call me, they can e-mail

20  me.  In fact, I asked them to text me anytime they want to.

21  Q.    Did you tell the --

22  A.    I have media in the audience today.  They have my

23  personal cell phone numbers.

24  Q.    Representative Reisch, did you tell the audience on

25  93.9 that Mr. Campbell had warrants out for his arrest?

1  A.     No, I said he had, H-A-D, had, according to Case.net.

2  It's public record, public information.  He failed to show up

3  in Centralia Municipal Court.  I'm a Certified Court

4  Administrator.  I did warrants.  I ran a court for 30 years,

5  and he couldn't even show up in court and had warrants for his

6  arrest.  That's a public record.  Not that he had current

7  active warrants.  You're misleading what I said.

8  Q.     And you said that on the radio in an effort to

9  undermine his credibility, didn't you?

10  A.     I'm just saying I don't know the guy.  All I know is

11  what a Google search told me.  So I googled his name.  I work

12  at a law firm, I run a law firm in Columbia, and you know what?

13  I'd never heard of this guy.

14  Q.     If you'll look at Exhibit 15, which is a series of

15  tweets on the 27th and 28th of March.  And if you'll look at

16  the second page of that exhibit at the top, could you read the

17  first tweet there?

18          MR. PEARSON:  Your Honor, may I have just a moment?

19          THE COURT:  Yes.

20          MR. PEARSON:  Thank you.

21          THE COURT:  For a possible objection, is that --

22          MR. PEARSON:  I wanted to read it before I made the

23  objection.

24          THE COURT:  Sure.

25          MR. PEARSON:  Your Honor, I've given Mr. Hirth a

1    little bit of latitude, but I think this goes to the same point

2    I made earlier, which is Ms. Reisch's commentary about the

3    litigation is not relevant to the First Amendment issue that's

4    been pleaded.  So I'm going to object to the question that's

5    before the Court.

6              THE COURT:  I'm trying to figure out how that's

7    relevant also.

8              MR. HIRTH:  I understand, Your Honor.  The issue

9    here is Twitter is a means of communicating with people that

10   Ms. Reisch uses frequently to talk about things that relate to

11   her office, including this case.  She has tweeted about Mr.

12   Campbell multiple times but did not extend the same courtesy to

13   him by blocking him.

14             And the point we're trying to make is that's the

15   purpose of Twitter, this is about having these open dialogues;

16   and we have a representative who will use it, but doesn't allow

17   her constituents to use it.  That's the point I want to make.

18             THE COURT:  Well, I think you make it, and you've

19   just made it without going through -- and part of this, I think

20   part of the defense's position is that this is not the

21   public -- they would totally disagree with what you just said.

22   And we wouldn't disagree that if I find favorably for that

23   position as a private, I can block you anytime I want to block

24   you, correct?

25             MR. HIRTH:  Absolutely.  Absolutely.

1          THE COURT:  Okay.  So I understand what you're

2    saying, but I think their position is clearly different than

3    that.  But, you know, I'm the trier of fact.  I understand what

4    you're saying.  So I'll give you --

5          MR. HIRTH:  I can move on.

6          THE COURT:  I've given you leeway, but we probably

7    should move on, thank you.  So I'll sustain the objection.  But

8    I understand.  Thank you.

9          MR. HIRTH:  I'll try to skip here to the end.  I

10   apologize to the Court.  I'm trying to eliminate as many

11   questions as I can.

12         THE COURT:  Related to --

13         MR. HIRTH:  The comments that Ms. Reisch has made in

14   response to the lawsuit.  I'm trying to skip over most of those

15   to -- in respect of your sustaining the objection.

16         THE COURT:  At some point, you can just direct the

17   Court to whatever, if you feel that's relevant to -- and I

18   think you do, relevant to your case, but I don't think you need

19   to go through every tweet.  You can direct me to the exhibit at

20   some point so I'll take that under consideration as I look.

21         MR. HIRTH:  Thank you, Your Honor.  I think I can

22   stop there, Your Honor.

23         THE COURT:  Okay.  Mr. Pearson?

24         MR. PEARSON:  Yes, Your Honor.  I guess I have a

25   procedural question for the Court.  The only witness I plan to

1  call in my case in chief is Representative Reisch, so I'm

2  prepared to do my entire examination now.  I don't know if --

3           THE COURT:  Yeah.  And I think typically that's how

4  we do it, so you don't have to necessarily call her in your

5  case in chief.  So, yeah, that's fine.

6           Obviously, Mr. Hirth, I'll give you the opportunity

7  to come back up.

8           MR. HIRTH:  Thank you, Your Honor.

9                         - - -

10                   CROSS-EXAMINATION

11  By Mr. Pearson:

12  Q.     I'm going to start, Representative, with the nature of

13  your employment as a member of the Missouri House of

14  Representatives.  So you were elected in 2016, correct?

15  A.     Correct, and then reelected in '18.  I'm one of 163

16  House members.  I am not the government.  I do not make laws.

17  I'm one of 163 in the House.

18  Q.     And when did you become an employee of the Missouri

19  House of Representatives?

20  A.     So that started in January 2017, I was sworn into

21  office.

22  Q.     So we've spent a lot of time looking at Exhibit 1.  And

23  I'm going to have a couple questions, so you might find that in

24  the book.

25  A.     Okay.  I'm there.

1  Q.      So is this Twitter feed -- let me ask it this way.

2          Do you engage in Twitter activity, tweeting,

3  commenting, liking, retweeting, while you are in the Missouri

4  Capitol?

5  A.      Oh, absolutely not.  We go through a training as a

6  newly elected official, and we must absolutely never ever do

7  any kind of campaigning or even the appearance of campaigning

8  in that capitol building.  I have never tweeted from in that

9  capitol building ever.  I do it from my phone, and usually from

10  when I'm at home in Hallsville.

11  Q.      Okay.  Is that phone that you just described paid for

12  by the State of Missouri?

13  A.      No, I've had the same phone number since cell phones

14  came into play.  I've had the same phone number, you can ask my

15  son -- it's the same phone number as City Hall where I worked

16  so my kids could remember it.  So I pay for it.  U.S. Cellular.

17  Q.      Does any employee of the State of Missouri assist you

18  in any way with your Twitter activity?

19  A.      No one ever, except my nephew.

20  Q.      And your nephew is not employed by the State of

21  Missouri, right?

22  A.      No.

23  Q.      Was he ever?

24  A.      No.

25  Q.      Let's take a look at Page 1 of Exhibit 1.  And

1   there's -- do you have that?

2   A.      Yes.

3   Q.      There's a banner photograph across the top.  Do you see

4   that?

5   A.      Yes, sir.

6   Q.      Where are -- and that's you, right?

7   A.      Correct.

8   Q.      Where are you in that photograph?

9   A.      So that photo was taken by my nephew Erik on the day of

10  my swearing-in in January of 2017 because I'm wearing the red

11  boutonniere or corsage, whatever you call it.  And so that was

12  my first day in office in '17, and my Twitter was started in

13  '15.

14  Q.      So that picture was taken by your nephew and not by,

15  say, a House-paid photographer, right?

16  A.      Oh, no.  No.

17  Q.      What about the little circle picture there?  Where are

18  you there?

19  A.      I'm in the House chamber.  My nephew Erik took that

20  picture again.  There's some others in my Twitter feed with him

21  with me taken by my brother, and then one with me and my

22  brother taken my him.  I love my family.

23  Q.      So do you use any State of Missouri resources in any

24  way on Exhibit 1?

25  A.      Absolutely not.  That would be an ethics violation.

1    Q.      You have, as a state representative, an office in the

2    State Capitol, right?

3    A.      I do.

4    Q.      And there's a computer there that's paid for by the

5    State, I suppose.

6    A.      Yes, they provide us with a computer.

7    Q.      And you don't -- do you ever use that computer to

8    tweet?

9    A.      Never.

10   Q.      Do you have any employees under your control who are

11   paid for by the Missouri House of Representatives?

12   A.      I have one legislative assistant.

13   Q.      What's her name, please?

14   A.      Valerie.

15   Q.      Does Valerie participate in your Twitter feed?

16   A.      No, never.  And the reason I laugh is she's older than

17   I am, and she doesn't have Facebook or Twitter.  She wouldn't

18   know how to tweet if she had to.

19   Q.      Does anybody employed by the State of Missouri tell you

20   what content should be on your personal Twitter feed,

21   Exhibit 1?

22   A.      No.  In fact, nobody tells me what to put on it except

23   my nephew Erik.  The State of Missouri, the House has never

24   told me what to tweet, what not to tweet, what to put on there,

25   what not to put on there.

1  Q.      You have an official -- ask this a little better.

2          As a member of the Missouri House, there is a

3  website that provides information about you; am I correct in

4  that assumption?

5  A.      The official House website does give some bio on every

6  representative, yes.

7  Q.      And it talks about maybe bills that you've sponsored

8  and that sort of thing.

9  A.      Correct.

10 Q.      Do you know what the URL for that website is?

11 A.      House.mo.gov.

12 Q.      And that website is not the one on Page 1 of Exhibit 1,

13 which is cheri44.com, right?

14 A.      Correct.

15 Q.      Completely separate.

16 A.      Completely separate.

17 Q.      Are you familiar with what we talked about about an

18 hour and a half ago, the terms of use of Twitter?

19 A.      Yeah, I am.

20 Q.      And would you agree with Mr. Hirth --

21         MR. PEARSON:  I'll just try to speed this along a

22 little, Your Honor.

23 BY MR. PEARSON:

24 Q.      Would you agree with Mr. Campbell that the terms of use

25 define the rules for Twitter?

1  A.     Correct.  Because it's a private company, and they set

2  the rules, and you have to follow the rules, you know, like if

3  you incite violence.  There's a fake Twitter account called

4  Cheri Toalson Reisch's Guns that's impersonating me, and they

5  incite violence, and I have had to report it to Twitter.  And

6  they keep taking down their tweets because it's -- it's telling

7  the world that I'm shooting people and I carry a gun in my

8  Bible, and it's inciting violence.  So they take down the fake

9  site that's impersonating me, as they should.  Or pornography

10 or anything else that's inappropriate.  Just like the fake

11 satire page that Facebook has that's impersonating me, and the

12 assassination threat I received on there.  I don't have to

13 listen to those people.

14        MR. PEARSON:  Can I just have a moment?

15        THE COURT:  Yes, sure.

16        MR. PEARSON:  Thank you.

17 BY MR. PEARSON:

18 Q.     Are you okay to proceed, Representative?

19 A.     Yes.

20 Q.     Thank you.  We talked -- I'm not sure we got this in

21 the record, so -- it's a pretty obvious question, but you're a

22 Republican.

23 A.     Correct.

24 Q.     And we've spoken about Representative Kip Kendrick at

25 some length.  And what's his political affiliation?

1    A.    Democrat.

2    Q.    And you testified earlier that it was Mr. Campbell's

3    retweet of Representative Kendrick's commentary that sort of

4    led to the blocking here, right?

5    A.    Correct, but I never blocked Kip Kendrick.  That was a

6    lie in the petition.  I never blocked Kip.  He's a colleague.

7    Q.    Why didn't you block him?

8    A.    Because I've worked with Kip since I was elected.

9    We're all representatives from Boone County.  We're trying to

10   do the greater good for Columbia and Boone County, and we have

11   to work across the aisle and work together as a team.  We're

12   working on multiple bills for Boone County together.

13   Q.    Do you have any sort of policy that you block all

14   people who disagree with you politically?

15   A.    No.  Two of my very best friends in the world are

16   Democrats, and one even voted for me.  She said I would be the

17   first and last Republican she'd ever vote for, and I love her

18   since I was a baby.

19   Q.    Other than Representative Kendrick, are there any

20   Democratic elected officials or Democratic organizations who

21   are followers of you on Twitter, to your knowledge?

22   A.    So the Boone County Democratic Party, you would see

23   that they are not on this block list.  I allow the Boone County

24   Democrats to follow me because I am Cheri Reisch.  So I do not

25   block all Democrat-following or leaning organizations at all.

1  You can go to their Twitter feed and see that I'm not

2  blocked -- blocking the Boone County Democrats or Kip Kendrick.

3  Q.      I want to ask you just a couple of questions about

4  Exhibit 5.  That's the list of blocked people that Mr. Hirth

5  asked you about.  I'm not going to go through them one by one,

6  but --

7          MR. PEARSON:  In fact, I'll withdraw that question,

8  Your Honor.  I don't need to go down that path.

9  BY MR. PEARSON:

10 Q.      After this lawsuit was filed, did you at some point

11 consider whether to just delete your Twitter feed and stop

12 using it?

13 A.      Yes.  In fact, I'm still considering it.  I may go walk

14 out this door today and just shut down by Twitter account, and

15 then nobody can contact me by Twitter if they wanted to.

16 Q.      And why would you do that?

17 A.      I don't need the headache hassle.  I'm old school.  If

18 people want to talk to me, they can pick up a phone, they can

19 use an e-mail, they can talk to me face to face.  I'm more of a

20 people person.  I like to talk to humans face to face.  I'm not

21 hiding behind some anonymous keyboard.

22         MR. PEARSON:  No further questions, Your Honor.

23         THE COURT:  Okay, thank you.  Why don't we do this.

24 Why don't we take about a ten-minute break, and then when we

25 resume, then, counsel, you'll have the opportunity to cross,

1  okay?  Or redirect.

2            (A recess was taken from 10:45 a.m. to 11:02 a.m.)

3            THE COURT:  Okay.  Mr. Hirth?

4            MR. HIRTH:  Your Honor, we have no redirect for the

5  defendant.

6            THE COURT:  Okay.  Thank you, you may step down,

7  ma'am.

8            Any further evidence from the plaintiff?

9            MR. HIRTH:  No evidence from the plaintiff, Your

10  Honor.

11            THE COURT:  Okay.  Do you all want to make any

12  summation or...

13            MR. PEARSON:  Defendants don't feel that that's

14  necessarily necessary, as long as Mr. Hirth agrees with me.

15            MR. HIRTH:  We agree with that, Your Honor.

16            THE COURT:  Okay.  Okay, great.  So I know we had

17  talked about this before that I was having, I don't know what

18  additional -- it's almost already been done in terms of the

19  findings of fact and conclusions of law.  And if you guys

20  wanted to -- I think we have talked about this before, just

21  submitting that to the Court?  You know, any additional facts

22  we have now or didn't have, then submit it.  How long do you

23  think it would take you all to do that?

24            MR. HIRTH:  So we have -- both Lowell and I have a

25  pretty busy schedule over the next month, so if we could have

1  45 days?  Is that --

2          MR. PEARSON:  Forty-five days would be fine, Your

3  Honor.

4          THE COURT:  Okay.  Why don't we do 45?  Why don't

5  we --

6          LAW CLERK:  June 3rd.

7          THE COURT:  June 3rd?  Wow, that's quick.  How did

8  you do that, June 3rd?

9          MR. PEARSON:  Sixty?

10         MR. HIRTH:  We can do 60.

11         THE COURT:  No, I'm not saying for my purposes.  She

12 just knew it was June 3rd, 45 days from now, that was my whole

13 point, that was pretty quick.

14         No, that's fine.  That is fine with the Court.

15 Yeah, that's fine.  You know, I don't have -- I didn't know if

16 you had more of a time -- you know, time sensitive in any way

17 for you all.

18         MR. PEARSON:  I don't think so, Your Honor.

19         THE COURT:  Okay.

20         MR. PEARSON:  That would allow my client to review

21 the document after the session ends in the middle of May, which

22 I would appreciate.  So I think that would be a courtesy to

23 Representative Reisch to get us past the middle of May.

24         THE COURT:  And I'm fine with that.  If you all are

25 okay with that, I'm fine with that also.

1          MR. PEARSON:  Thank you.

2          THE COURT:  Okay.  Let me --

3          (The Court conferred privately with court staff.)

4          THE COURT:  Thank you.  I have to get my think tank

5   with me to see if there's anything I needed to ask you all, but

6   I think you guys have given us everything we need ultimately to

7   make our decision.  We'll be awaiting the proposed findings of

8   fact and conclusions of law in 45 days, and then the Court will

9   be in a position to rule at that point.

10          But I appreciate the evidence, appreciate you all

11  coming in.  I didn't realize what this day was until -- you

12  know, Good Friday in terms of that.  But at least we put on the

13  evidence, and the Court will be ready to rule once I receive

14  your motions.  So, thank you all.

15          (Trial adjourned.)

16                              - - -

17                              - - -

18                           **CERTIFICATE**

19          I certify that the foregoing is a correct transcript

20  from the record of proceedings in the above-entitled matter.

21

22

23   May 1, 2019

24                      /s/_____
                        Kathleen M. Wirt, RDR, CRR
25                      U.S. Court Reporter