IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| MIKE CAMPBELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:18-CV-4129-BCW |
| ) | |
| CHERI TOALSON REISCH, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On April 19, 2019, the Court held a bench trial in the above-captioned case. Plaintiff Mike Campbell appeared in person and through counsel J. Andrew Hirth. Defendant Representative Cheri Toalson Reisch appeared in person and through counsel Lowell D. Pearson and Michael Owens. The Court, being duly advised of the premises, having considered the record, the evidence presented at trial, and the parties' proposed findings of fact and conclusions of law, finds as follows.

Plaintiff seeks declaratory and injunctive relief against Defendant under 42 U.S.C. § 1983. Specifically, Plaintiff seeks a declaration that Defendant's blocking Plaintiff on Twitter "is a viewpoint-based restriction of speech in a designated public forum in violation of the First and Fourteenth Amendments." (Doc. #22). Additionally, Plaintiff seeks a permanent injunction barring Defendant from continuing to block Plaintiff from her Twitter page based on the content or viewpoint of Plaintiff's speech, and further, barring Defendant from blocking any other Twitter user based on the content or viewpoint of those users' speech.

1

## FINDINGS OF FACT

**1.** Plaintiff is an adult resident of Centralia, Missouri who is a registered voter within district that Defendant represents.

**2.** Defendant is an adult resident of Hallsville, Missouri, and is a State Representative for the 44th District of the Missouri House of Representatives.

**3.** Twitter is a social media platform with more than 300 million active users worldwide, including approximately 70 million users in the United States.

**4.** Twitter allows users to publish short messages to the general public called "tweets"; to republish or respond to others' tweets; and to interact with other Twitter users.

**5.** A tweet may include photographs, videos, and hyperlinks but cannot exceed 280 characters.

**6.** Each Twitter user has a unique account name or "handle," which comprises an @ symbol followed by a word or phrase.

**7.** Users may choose to "follow" other Twitter account holders by searching for their handles and clicking the "follow" button.

**8.** A "followed" user's tweets automatically appear in the "following" user's Twitter "feed," which is a continuously-updating scroll of new tweets from other users.

**9.** A user may comment on the tweets of other users, or she may "retweet" their tweets to her own followers.

**10.** Users may also see a log of their own past tweets, comments, and retweets, along with any comments or retweets they have received from their own followers.

**11.** Some Twitter users publish hundreds of tweets per day while others merely read the tweets that appear in their Twitter feed.

**12.**   Twitter also allows its users to block certain other users from following their tweets.

**13.**   If the blocked user attempts to follow the blocking user, or attempts to access the Twitter account from which the user is blocked, the blocked user will see a message indicating that the other user has blocked her from following the account and viewing the tweets associated with the account.

**14.**   Like many members of the Missouri General Assembly, Defendant has a Twitter account.

**15.**   Defendant uses the Twitter handle @CheriMO44.

**16.**   The "MO44" in her Twitter handle "CheriMO44" refers to the 44th District of the Missouri House of Representatives, for which Defendant is the elected representatives.

**17.**   On her Twitter page, Defendant describes herself as a "Christian, MO State Rep 44th District, Mother, Grandmother."

**18.**   Below Defendant's description on her Twitter page is a circle with a downward facing point and the words "District 44, Missouri, USA," which refers to her district in the Missouri House.

**19.**   Below the reference to her house district is a link to cheri44.com, which is Defendant's campaign page.

**20.**   The banner photo at the top of Defendant's Twitter page shows Defendant sitting at her desk on the House floor.

**21.**   The circular photo above Defendant's profile shows Defendant on the House floor.

**22.**   Defendant's Twitter account was created in September 2015 when she announced her candidacy for the 44th District of the Missouri House.

**23.**   The first tweet from Defendant's Twitter account, which was written by Defendant's nephew and released on September 21, 2015 stated, "I am proud to announce my candidacy to

represent Missouri's 44th District. Let's work together and create opportunities for jobs and education."

24. On November 17, 2015, Defendant tweeted a copy of a letter on her campaign stationery seeking contributions to her campaign for the 44th Missouri House seat.

25. On November 20, 2015, Defendant tweeted a photograph of herself standing with Missouri House Speaker Todd Richardson and thanking him for his leadership in the House.

26. Throughout the first ten months of 2016, Defendant posted dozens of tweets about her campaign for the Missouri House, frequently using the hashtags #MO44 and #TeamCheri.

27. On November 8, 2018, Defendant announced her successful election as Representative of the 44th House District on her Twitter account.

28. During her first 18 months in office, Defendant routinely tweeted or retweeted about her work as a state representative and posted pictures of herself on the House floor or standing with other elected officials.

    a. On January 4, 2017, Defendant tweeted a photo of herself at her desk in the House floor with the caption, "Today I was humbled to commit myself to represent everyone in the 44th District & uphold the Constitution of Missouri. #MOLeg."

    b. On January 29, 2017, Defendant tweeted a picture of her office with the caption, "Thrilled to have so many of my neighbors from the 44th District come by the office at tonight's energetic Governor's Ball. #MOLeg #MO44."

c. On March 22, 2017, Defendant retweeted a post by @MOHouse GOP declaring, "We are proud to deliver results during the first half of the session that will bring job growth to MO. #moleg."

d. On May 22, 2017, Defendant tweeted a photograph of herself with House Speaker Todd Richardson with the caption, "I promised my neighbors in #MO44 that I'd work tirelessly to improve our #economy. I'm making good on that promise."

e. On June 12, 2017, Defendant tweeted about the passage of the Real ID bill.

f. On July 12, 2017, Defendant tweeted about "Right to Work" and tort reform legislation.

g. On August 16, 2017, Defendant tweeted, "I testified before the Senate today to repeal prevailing wage. Saves taxpayers $, helps schools, cites, etc."

h. On September 7, 2017, Defendant tweeted a photo of herself with Governor Greitens and the caption, "Toured @3M facility in my district today w/Gov @EricGreitens. Glad to hear they are growing & bringing new jobs w/help of #MOLeg policies!"

i. On October 19, 2017, Defendant tweeted a photo of herself with then-Lieutenant Governor Parson with the caption, "Glad to have Lt. Gov @MikeParsonforMO in my District for Associated Industries of MO."

j. On November 13, 2017, Defendant tweeted, "Congrats to @RobVescovo our new Floor Leader. We both at times, can be that bull in the china cabinet if we need to be."

    **k.** On December 9, 2017, Defendant tweeted her legislative scorecard from United for Missouri, adding: "I scored an A.  Not bad for a Freshman."

    **l.** On March 14, Defendant tweeted about a picnic in her House office, writing, "My office is in the People's House.  It's all of ours to share in its glory."

    **m.** On May 18, 2018, Defendant retweeted a message from House Speaker Todd Richardson with the comment, "Thank you Mr. Speaker, you are a true gentleman.  We worked hard and got the job done."

    **n.** On June 13, 2018 Defendant tweeted, "Accomplished much in my 1st 2 years, ready for the next 2."

**29.** Defendant testified that she reads letters mailed to her from her constituents.

**30.** Defendant testified her constituents are not required to contact her through any particular medium; they can reach Defendant in person, by phone, by mail, or by email.

**31.** Defendant also testified she does not consider Twitter a way in which she communicates with her constituents, or a medium through which Defendant invites communication.

**32.** Defendant has used her Twitter page to engage in discourse about political topics and/or to indicate her position relative to other government officials.

**33.** On June 22, 2018, Defendant tweeted about her appearance at a Boone County, Missouri Farm Bureau event. Defendant tweeted "Sad my opponent put her hands behind her back during the Pledge," about Maren Jones, Defendant's political opponent who was also present at the event.

**34.** On June 23, 2018, Representative Kip Kendrick commented on Defendant's tweet, as follows: "Maren's father was a Lieutenant in the Army. Two of her brothers served in the military.

I don't question [Maren's] patriotism. That's a low blow and unacceptable from a member of the Boone County delegation."

**35.**     Plaintiff retweeted Representative Kendrick's response to Defendant's tweet on Plaintiff's own Twitter page.

**36.**     Plaintiff's Twitter handle is "@attorneymikec."

**37.**     Plaintiff testified he retweeted Representative Kendrick's tweet to provide to the public "context for what [Defendant] was tweeting out into the public sphere."

**38.**     After Plaintiff retweeted Representative Kendrick's tweet, he received notice he had been blocked from Defendant's Twitter account.

**39.**     Plaintiff posted to Twitter a photo of the notice he received indicating that Defendant had blocked him.

**41**.     Because Defendant blocked Plaintiff, he was unable to comment on Defendant's Twitter page, or otherwise join in the conversation with Defendant's Twitter followers relative to Defendant's original tweet.

**42.**     Defendant testified she did not block Plaintiff due to name-calling or vitriolic speech.

**43.**     Besides Plaintiff, Defendant has blocked at least 123 other Twitter users.

## CONCLUSIONS OF LAW

The Court must determine whether Plaintiff has demonstrated that Defendant violated 42 U.S.C. § 1983 when she blocked Plaintiff on Twitter.

"Section 1983 provides a remedy against any person who, under color of state law, deprives another rights protected by the Constitution." Collins v. City of Harker Heights, Tex., 503 U.S. 115, 130 n.3 (1992) (citing 42 U.S.C. § 1983). A § 1983 plaintiff must demonstrate two elements, as follows: (1) the plaintiff was "deprived of a right secured by the Constitution or laws of the

7

United States"; and (2) "the alleged deprivation was committed under color of state law." <u>Am. Mfrs. Mut. Ins. Co. v. Sullivan</u>, 526 U.S. 40, 49-50 (1999). With respect to this second element, "the under-color-of-state-law element of § 1983 excludes from its reach "private conduct, no matter how discriminatory or wrongful." <u>Id.</u> at 50 (citing <u>Blum v. Yaretsky</u>, 457 U.S. 991, 1002 (1982) (quoting <u>Shelley v. Kraemer</u>, 334 U.S. 1, 13 (1948))).

**A. Plaintiff was deprived of a right secured by the Constitution.**

Plaintiff asserts Defendant deprived him of his free speech rights under the First Amendment by blocking Plaintiff on Twitter, thus limiting Plaintiff's access to Defendant's account. Defendant argues her Twitter account is not public property or private property dedicated to public use, such that Plaintiff's access to it is not protected by the First Amendment.

The issue of whether Plaintiff was deprived of his right to free speech under the First Amendment involves three considerations. <u>Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.</u>, 473 U.S. 788, 797 (1985). First, the Court must determine that the speech in which the plaintiff engaged, or seeks to engage, is protected speech. <u>Id.</u> Second, if the speech at issue is protected speech, then the Court considers whether the "place" where the plaintiff would seek to engage in the speech at issue is susceptible to forum analysis. <u>Id.</u>; <u>Ark. Educ. Television Comm'n v. Forbes</u>, 523 U.S. 666, 677 (1998). Third, if the place at issue is subject to forum analysis, then the Court must determine the type of forum. <u>Cornelius</u>, 473 U.S. at 797. Determination of the type of forum is important because the type of forum corresponds with the limits on the government's power to regulate speech without running afoul of the First Amendment. <u>Id.</u> at 800.

       1.     **Plaintiff's retweet is protected speech.**

"As a general matter, government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." <u>Brown v. Entm't Merchs. Ass'n</u>, 564 U.S.

786, 791 (2011) (citing Ashcroft v. Am. Civil Liberties Union, 535 U.S. 564, 573 (2002)). Certain narrow legal categories of speech, such as obscenity, defamation, fraud, incitement, and speech integral to criminal conduct, are not protected under the First Amendment. R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 383 (1992).

"[S]peech on matters of public concern fall within the core of First Amendment protection." Knight First Amendment Inst. at Columbia Univ. v. Trump, 302 F. Supp. 3d 541, 565 (S.D.N.Y. 2018) ("Knight I") (citing Engquist v. Ore. Dep't of Agric., 553 U.S. 591, 600 (2008)). Additionally, as a general premise, "social media is entitled to the same First Amendment protections as other forms of media." Knight First Amendment Inst. at Columbia Univ. v. Trump, 928 F.3d 226, 237 (2d Cir. 2019) ("Knight II") (citing Packingham v. North Carolina, 137 S. Ct. 1730 (2017)).

In this case, the speech at issue is Plaintiff's retweet of another representative's tweet that was critical of a previous tweet made by Defendant, and Plaintiff's ability to access and interact with other Twitter users relative to Defendant's Twitter account. The record does not suggest that this speech falls within any of the unprotected categories of speech listed above. Therefore, the Court concludes the speech at issue is protected.

**2. The interactive space of Defendant's Twitter account is subject to forum analysis.**

Next, having concluded the speech at issue is protected by the First Amendment, the Court must determine whether the interactive space of Defendant's Twitter account is susceptible to forum analysis.

Plaintiff argues Defendant's Twitter account is susceptible to forum analysis in primary reliance on Knight I and Knight II. The relevant issue in those cases was "whether a public official may, consistent with the First Amendment, "block" a person from his Twitter account in response

9

to the political views that person has expressed . . . ." Knight I, 302 F. Supp. 3d at 549. In Knight II, the Second Circuit affirmed the district court's holding that a public official's "tweet's interactive space . . . is properly analyzed under the Supreme Court's forum precedents." Knight I, 302 F. Supp. 3d at 573, aff'd, Knight II, 928 F.3d at 233.

Defendant argues, conversely and in primary reliance on Morgan v. Bevin, that the interactive space of a public official's Twitter account is not susceptible to forum analysis because it is not a public space. 298 F. Supp. 3d 1003 (E.D. Ky. 2018). In Morgan, the District Court for the Eastern District of Kentucky denied the plaintiffs' motion for preliminary injunction against the defendant's blocking them on social media. The district court in Morgan found the public official's use of social media to equate to personal speech or government speech, and also that "there is no constitutional right as members of the public to a government audience for their policy views." 298 F. Supp. 3d at 1011.

The parties do not dispute that Plaintiff seeks access to the interactive space of Defendant's tweets. Knight I, 302 F. Supp. 3d at 565 (citing Cornelius, 473 U.S. at 801) (isolating the putative forum through reference to "the access sought by the speaker"). The Court must resolve, in the absence of binding authority, whether the interactive space of Defendants' tweets is subject to forum analysis, in that the interactive space of Defendant's twitter account is owned or controlled by the government. Knight I, 302 F. Supp. 3d at 566 (citing Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez, 561 U.S. 661, 679 (2010) ("[A] space may be a forum based on government control even absent legal ownership.")).

Forum analysis applies where a speaker seeks "access to public property, or private property dedicated to public use." Cornelius, 473 U.S. at 801. Public property is that "which ha[s] immemorially been held in trust for the use of the public and, time out of mind, ha[s] been used

for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 469 (2009) (citing Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983)); Lehman v. City of Shaker Heights, 418 U.S. 298, 303 (1974) (listing open spaces, meeting halls, parks, street corners, and thoroughfares as potential public property). Private property dedicated to public use is that which is not owned by the government, but that which is still controlled by the government, particularly with respect to whether the "[g]overnment can control access." Knight I, 302 F. Supp. 3d at 566 (citing Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 555 (1975) (finding a public forum in a privately-owned theater under long-term lease to city)).

"Further, the application of forum doctrine must be consistent with the purpose, structure, and intended use of the space." Knight I, 302 F. Supp. 3d at 565 (citing Pleasant Grove, 555 U.S. at 480. There exists no requirement that the space to which forum analysis might apply "be spatial or geographic and the same principles are applicable to a metaphysical forum." Knight II, 302 F. Supp. 3d at 237.

There is no dispute that Twitter, Inc. owns Defendant's Twitter account, such that the account is not owned by the government. Therefore, under the circumstances of this case, forum analysis applies to the interactive space of Defendant's Twitter only if the government controls it.

Defendant controls the content of her tweets and can, through blocking, prevent other Twitter users like Plaintiff from accessing the interactive space of Defendant's tweets. Even though Defendant does not control the functions available on Twitter, Defendant has control over the use of those functions, including the block function, which ultimately allows Defendant to curate the interactive space on her account. Consequently, Defendant controls access to the interactive space of her tweets.

11

Moreover, Defendant's control, under the circumstance of this case, equates to government control. The creation of Defendant's Twitter account coincided with the start of her campaign for state representative, and @CheriMO44 references Defendant's role as a state representative and her elected district. While Defendant's Twitter account also contains personal references, Defendant's government associations overshadow these. Specifically, the image associated with Defendant's account is a photo of Defendant on the state house floor; Defendant's campaign webpage is linked to the account; and Defendant uses the Twitter account to indicate her political positions relative to other government officials and/or to engage in political discourse.

Thus, in primary reliance on Knight I and Knight II, the Court finds that the interactive space of Defendant's tweets to which Plaintiff seeks access are sufficiently controlled by Defendant in her capacity as a state legislator, such that the interactive space is government-controlled and subject to forum analysis.

**3. The interactive spaces of Defendant's tweets are a designated public forum.**

Plaintiff argues the interactive spaces of Defendant's tweets are a designated public forum, while Defendant argues forum analysis is inapplicable. With the Court having concluded that forum analysis applies to the interactive spaces of Defendant's tweets, the remaining consideration on the issue of the deprivation of a constitutional right is the type of forum at issue: (a) traditional public forum; (2) designated public forum; or (3) nonpublic forum. Bowman v. White, 444 F.3d 967, 974 (8th Cir. 2006) (citing Families Achieving Independence & Respect v. Neb. Dep't of Soc. Servs., 111 F.3d 1408, 1418 (8th Cir. 1997)).

A traditional public forum is: (1) owned or controlled by the government; (2) was created for the purpose of public access "or for a purpose inherently compatible with expressive conduct"; and (3) is traditionally been used for expressive conduct. Bowman, 444 F.3d at 984. "Absent a

well-established history of dedication to public use . . . a forum cannot be a traditional public forum." Knight I, 302 F. Supp. 3d at 573.

A designated public forum "consists of public property which the state has opened for use by the public as a place for expressive activity." Id. (citing Perry, 460 U.S. at 45). "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse . . . ." Knight I, 302 F. Supp. 3d at 574 (citing Cornelius, 473 U.S. at 802).

Finally, a nonpublic forum is a place that is subject to forum analysis, in that it is government owned or controlled, but that is "not by tradition or designation a forum for public communication." Knight I, 302 F. Supp. 3d at 574.

In this case, while the interactive spaces of Defendant's tweets are government-controlled as concluded above, the interactive spaces do not otherwise fulfill the requirements of a traditional public forum. Bowman, 444 F.3d at 984.

Next, the Court considers whether the interactive spaces are properly categorized as a designated public forum. The touchstone of a designated public forum is government intent, which is inferred from several objective factors, including policy and practice, the nature of the property, and the property's "compatibility with expressive activity." Bowman, 444 F.3d at 991 n.9.

The record demonstrates Defendant's uses her Twitter account to indicate her positions on political issues, and to promote her campaign and legislative agenda. Twitter provides an electronic space through which other Twitter users can seek out and receive information and react to Defendant's tweets. Social media sites, like Twitter, are compatible with, and indeed are arguably centered on, expressive activity. Knight I, 305 F. Supp. 3d at 574. Although Defendant would perhaps prefer communications with her constituents through telephone or mail, Defendant

intentionally created an avenue through which to receive communications from the public. Defendant launched her Twitter account when she launched her political campaign. Defendant tweets about campaign events, promotes her agenda, and tweets about her political positions relative to other public officials. For these reasons, having considered the relevant factors relating to government intent, the Court concludes the interactive spaces of Defendant's tweets are properly considered a designated public forum.[1]

### 4. Plaintiff's exclusion from the interactive spaces of Defendant's Twitter violates Plaintiff's constitutional rights.

As mentioned above, the type of forum at issue determines the applicable standards for when a government restriction amounts to a First Amendment violation. Cornelius, 473 U.S. at 800. Because the interactive spaces of Defendant's tweets are aptly categorized as a designated public forum, the following limits on constitutional government regulation of speech apply: "[t]he government may enforce a content-neutral time, place, and manner restriction only if the restriction is necessary to serve a significant government interest and is narrowly drawn to achieve that interest." Bowman, 444 F.3d at 976 (citing Perry, 460 U.S. at 46).

The Court must determine whether Defendant's blocking of Plaintiff from the interactive spaces of her tweets was content-neutral, necessary to serve a significant interest, and narrowly drawn to achieve that interest.

In this case, the record shows Plaintiff received notice that Defendant blocked him shortly after he retweeted a reply to Defendant that was critical of Defendant's original tweet on a matter of public concern. This sequence gives rise to the inference that Defendant blocked Plaintiff based on his support of Representative Kendrick's position, as opposed to Defendant's position. Based

---

[1] Because the interactive space is a designated public forum, it is, by definition, not a nonpublic forum, and the Court need not analyze that option. Knight I, 302 F. Supp. 3d at 574.

on the record in this case, the Court concludes Defendant blocked Plaintiff based on his expressive activity in critique of Defendant. Defendant's action in blocking Plaintiff is not content-neutral. Davison v. Randall, 912 F.3d 666, 687 (4th Cir. 2019) ("Viewpoint discrimination is apparent, for example, if a government official's decision to take a challenged action was impermissibly motivated by a desire to suppress a particular point of view."); Cornelius. 474 U.S. at 812-13. Plaintiff's continued exclusion from the interactive space of Defendant's tweets based on viewpoint is inconsistent with the First Amendment. The Court thus concludes Plaintiff has established the deprivation of a constitutional right for purposes of his § 1983 claim.

**B. Plaintiff's deprivation occurred under color of state law.**

To be entitled to relief under § 1983, Plaintiff must also show he was deprived of a constitutional right under color of state law.

"[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." Roe v. Humke, 128 F.3d 1213, 1215 (8th Cir. 1997). The "color of law" "inquiry is necessarily fact intensive," and requires the Court to find the existence of "a sufficient nexus exists between the official's public position and the official's harmful conduct." Ramirez–Peyro v. Holder, 574 F.3d 893, 900-01 (8th Cir. 2009). "The [color of law] element is satisfied if the defendant acts or purports to act in the performance of official duties, even if he oversteps his authority and misuses power." Johnson v. Phillips, 664 F.3d 232, 240 (8th Cir. 2011). With particular reference to issues arising under the First Amendment, "a challenged action by a governmental official is fairly attributable to the state when the sole intention of the official in taking the action was to suppress speech critical of his conduct of official duties or fitness for public office." Davison, 912 F.3d at 680 (citing Rossignol v. Voorhaar, 316 F.3d 516, 524 (4th Cir. 2003), cert. denied, 540 U.S. 822 (2003).

In this case, Defendant blocked Plaintiff after he retweeted criticism of Defendant's position with respect to a political opponent. The Court has already determined the interactive space of Defendant's Twitter account is controlled by Defendant, in her capacity as a state legislator. As referenced above, Defendant launched her Twitter account alongside her political campaign. Defendant's handle references her elected district, and her Twitter account links to her campaign webpage. Further, the image associated with Defendant's Twitter account is a photo of her on the state house floor. Finally, Defendant used the Twitter account to tweet about her work as a public official. In the absence of evidence suggesting Defendant blocked Plaintiff for any reason other than to exclude comments critical of Defendant's role as a public official, the Court finds Defendant's actions were under color of state law.

For all of these reasons, the Court finds that based on the record and the applicable law, Plaintiff has proven that Defendant violated § 1983, and Plaintiff is entitled to declaratory and injunctive relief.

IT IS SO ORDERED.


DATE: <u>August 16, 2019</u>        <u>/s/ Brian C. Wimes            </u>
                                    JUDGE BRIAN C. WIMES
                                    UNITED STATES DISTRICT COURT